836 F.2d 1001
 In re Gary GILLIS, Secretary of Revenue of the State of
Kentucky; Clayton Foster, Property Valuation Administrator
of Hopkins County, Kentucky; Emogene Geary, Property
Valuation Administrator of Ohio County, Kentucky; Robert
McLearn, Property Valuation Administrator of Muhlenberg
County, Kentucky; Jerry Blanton, Property Valuation
Administrator of Harlan County, Kentucky; and H.E. Grace,
Property Valuation Administrator of Bell County, Kentucky,
Petitioners.
 No. 87-5078.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 25, 1987.
Decided Jan. 5, 1988.
 
 Douglas M. Dowell (argued), Ross T. Carter, James D. Brannen, Frankfort, Ky., Henry Hayden, Hayden and McKown, Hartford, Ky., for petitioners.
 J. Richard Cohen (argued), Montgomery, Ala., Joe Childers, Lexington, Ky., for respondent.
 Before JONES, WELLFORD and GUY, Circuit Judges.
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 Petitioner, Gary Gillis, along with the county property valuation administrators of the state of Kentucky, seeks a writ of mandamus requiring the district court to enter an order of dismissal in Nowak v. Foster, No. C84-0057-P (W.D.Ky.Sept. 5, 1985), for lack of subject matter jurisdiction. Petitioners are the named defendants in that case. Pursuant to our authority under the All Writs Statute, 28 U.S.C. Sec. 1651, and for the reasons stated below, the petition shall be granted and the writ shall issue.
 
 I.
 
 2
 On February 17, 1984, a complaint was filed with the United States District Court for the Western District of Kentucky. Plaintiffs alleged that they were citizens and taxpayers of the commonwealth of Kentucky and that their taxable property was "assessed at fair cash value, or its full agricultural or horticultural value, in accordance with law." Named as a defendant was Gary Gillis, Secretary of Revenue of the commonwealth of Kentucky. As Secretary of Revenue, Mr. Gillis is head of the Revenue Cabinet, which has some supervisory authority over property valuation administrators. Ky.Rev.Stat. Sec. 131.020. The other named defendants were property valuation administrators of six counties in Kentucky. These officers are responsible for assessing all taxable property within their counties. Ky.Rev.Stat. Secs. 132.420, 132.450.
 
 
 3
 The action was brought pursuant to 42 U.S.C. Sec. 1983. Plaintiffs complained that "[a]s a result of the acts and omissions of the defendants, the taxable property in [Kentucky] owned by coal, oil and gas interests [was] systematically assessed for taxation purposes at substantially less than its fair cash value." This property included "land, improvements to land, equipment and unextracted coal, oil and gas." Because their property was assessed at its full fair cash value, plaintiffs asserted that this alleged "systematic underassessment of property held by coal, oil and gas interests" violated their right to equal protection of law.
 
 
 4
 Additionally, plaintiffs requested certification of both a plaintiff class ("all citizens of the State of Kentucky who own taxable property in the state and whose property is assessed at fair cash value, or full agricultural or horticultural value, in accordance with law") and a defendant class ("all property valuation administrators of counties in which taxable property owned by coal, oil or gas interests is located"). Class certification was sought pursuant to Fed.R.Civ.P. 23(b)(2). On April 9, 1986, the court entered an order certifying both classes.
 
 
 5
 In their prayer for relief, plaintiffs asked that the court: (1) declare that the defendants' assessments of property owned by coal, oil, and gas interests violates plaintiffs' rights to equal protection of law; (2) enter a permanent injunction against the defendants and the defendant class requiring them to assess all real and personal property owned by coal, oil, and gas interests at fair cash value; and (3) award the plaintiffs reasonable costs and attorney fees.
 
 
 6
 On May 10, 1984, the defendants moved to dismiss the action on the grounds that (1) the court lacked subject matter jurisdiction of the complaint because of the Tax Injunction Act, 28 U.S.C. Sec. 1341 and the related principle of comity as enunciated in cases such as Fair Assessment in Real Estate Ass'n v. McNary, 454 U.S. 100, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981); (2) the plaintiffs lacked standing to bring the action; and (3) the action was barred by the Eleventh Amendment to the United States Constitution. On September 11, 1985, the court entered its order holding that plaintiffs' action was not barred either by the Tax Injunction Act or the doctrine of comity because the complaint sought to "enhance rather than inhibit the assessment of taxes in Kentucky." Defendants moved the court to reconsider its decision on the motion to dismiss or to certify its order denying the motion for immediate appeal under 28 U.S.C. Sec. 1292(b) on November 14, 1986. On January 23, 1987, after the filing of the petition herein, the district court denied defendants' motion to reconsider or certify.
 
 
 7
 The petition for writ of mandamus was filed on January 22, 1987. Petitioners contend that the district court erred in failing to dismiss the civil action in question on the grounds that it was barred by the Tax Injunction Act and the principle of comity underlying and augmenting the Act. In addition, petitioners assert that the court erred in failing to dismiss on the ground that the plaintiffs' lack standing to seek adjudication of the claim asserted.[1]
 
 II.
 The Tax Injunction Act
 
 8
 The Tax Injunction Act states simply that the district courts "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. Sec. 1341. The statute "has its roots in equity practice, in principles of federalism, and in recognition of the imperative need of a State to administer its own fiscal operations." Rosewell v. LaSalle Nat'l Bank, 450 U.S. 503, 522, 101 S.Ct. 1221, 1234, 67 L.Ed.2d 464, reh'g denied, 451 U.S. 1011 (1981) (quoting Tully v. Griffin, Inc., 429 U.S. 68, 73, 97 S.Ct. 219, 222, 50 L.Ed.2d 227 (1976)). "This last consideration was the principal motivating force behind the Act: this legislation was first and foremost a vehicle to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes." Rosewell, 450 U.S. at 522, 101 S.Ct. at 1234 (citing 81 Cong.Rec. 1415 (1937) (remarks of Sen. Bone)).
 
 
 9
 The Supreme Court has long recognized the dangers inherent in disrupting the administration of state tax systems:
 
 
 10
 It is upon taxation that the several States chiefly rely to obtain the means to carry on their respective governments, and it is of the utmost importance to all of them that the modes adopted to enforce the tax levied should be interfered with as little as possible. Any delay in the proceedings of the officers, upon whom the duty is devolved of collecting the taxes, may derange the operations of government, and thereby cause serious detriment to the public.
 
 
 11
 Dows v. City of Chicago, 78 U.S. (11 Wall.) 108, 110, 20 L.Ed. 65 (1870).
 
 
 12
 The Act divests district courts not only of jurisdiction to issue an injunction enjoining state officials, but also of jurisdiction to take actions that "suspend or restrain" the assessment and collection of state taxes. California v. Grace Brethren Church, 457 U.S. 393, 408, 102 S.Ct. 2498, 2507, 73 L.Ed.2d 93 (1982). Moreover, the Act also prohibits a district court from issuing a declaratory judgment holding state tax laws unconstitutional. Id.
 
 
 13
 In arguing that the Tax Injunction Act did not bar their claim, respondents relied principally on Hargrave v. McKinney, 413 F.2d 320 (5th Cir.1969), and its progeny. Plaintiffs there challenged a state statute providing that any county imposing ad valorem property taxes for educational purposes above a certain rate would not be eligible to receive state funds to support its educational system. Because the plaintiffs' suit challenged the constitutionality of a state taxing statute, the district court held that it was barred by the Tax Injunction Act. The Fifth Circuit reversed, stating:
 
 
 14
 It is clear that this suit does not come within the literal language of Section 1341. It is not a suit to enjoin, restrain or suspend the collection of a tax, but to the contrary is a suit to require the collection of taxes which citizens of a county have voted to impose on freeholders in the county. Thus, we must resolve the narrow question of whether the policies which underlie Section 1341 operate so as to make that section a jurisdictional bar to the maintenance of this action.... In view of the legislative history of this section and the myriad of cases holding generally that Section 1341 should be applied so as to protect the integrity of the state treasury, we hold that this section does not, as a jurisdictional matter, bar plaintiffs from the federal courts.
 
 413 F.2d at 326 (emphasis added).[2]
 
 15
 Respondents again assert that because their claim would not suspend or restrain the collection of taxes, but instead seeks to enhance the collection of taxes, under Hargrave their case is not barred by the Tax Injunction Act.[3] Respondents acknowledge that in Grace Brethren, the Court held that district courts are barred from issuing declaratory judgments holding state tax laws unconstitutional. 457 U.S. at 408, 102 S.Ct. at 2507. Nevertheless, they assert that declaratory relief is only unavailable under the same circumstances that injunctive relief is unavailable; that is, only when the collection of state taxes is interfered with. Respondents thus contend that there is no bar here to injunctive or declaratory relief.
 
 
 16
 We do not believe that the Grace Brethren ruling was as narrow as respondents contend. First of all, the Tax Injunction Act does not speak only to the collection of taxes; it refers as well to the assessment and levy of taxes. While admittedly the great majority of cases present plaintiffs seeking to enjoin the collection of taxes, and certainly the most direct threat to the state fisc is presented when the collection of taxes is enjoined, still the Act is not, by its own language, limited to the collection of taxes.
 
 
 17
 Secondly, the broad language used by the Grace Brethren court suggests anything but a narrow limitation on the power of courts to issue declaratory judgments:
 
 
 18
 Because the declaratory judgment "procedure may in every practical sense operate to suspend collection of the state taxes until the litigation is ended," Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 299, [63 S.Ct. 1070, 1073, 87 L.Ed. 1407] (1943), the very language of the Act suggests that a federal court is prohibited from issuing declaratory relief in state tax cases. Additionally, because there is little practical difference between injunctive and declaratory relief, we would be hard pressed to conclude that Congress intended to prohibit taxpayers from seeking one form of anticipatory relief against state tax officials in federal court, while permitting them to seek another, thereby defeating the principal purpose of the Tax Injunction Act: "to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes." Rosewell v. LaSalle National Bank, 450 U.S. 503, 522 [101 S.Ct. 1221, 1234, 67 L.Ed.2d 464] (1981).
 
 
 19
 457 U.S. at 408-09, 102 S.Ct. at 2507-08 (footnote omitted).
 
 
 20
 Thus, respondents' argument that the prohibition on the availability of declaratory relief is coextensive with the prohibition on injunctive relief suggests to us, if anything, that injunctive relief is broadly unavailable as well. Nevertheless, it is true that the particular declaratory and injunctive relief sought in the district court by respondents does not fall within the literal language of the Tax Injunction Act. Whether the Tax Injunction Act actually does bar the availability of such relief we find unnecessary to decide, because we conclude that principles of comity, which underlie and augment the Act, bar the action brought by respondents in the district court.
 
 III.
 Comity
 
 21
 Although the Tax Injunction Act may not be applicable, we cannot ignore the policies underlying the Act. "[E]ven where the Tax Injunction Act would not bar federal-court interference in state tax administration, principles of federal equity may nevertheless counsel the withholding of relief." Rosewell, 450 U.S. at 525 n. 33, 101 S.Ct. at 1235 n. 33. Thus, even if the facts of a state tax matter do not technically fit within the language of Sec. 1341, the federal courts should restrain from interfering in the state proceedings. Alcan Aluminum v. Department of Revenue, 724 F.2d 1294 (7th Cir.1984).
 
 
 22
 Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943), sets forth the basis for this judicial restraint:
 
 
 23
 This Court has recognized that the federal courts, in the exercise of the sound discretion which has traditionally guided courts of equity in granting or withholding the extraordinary relief which they may afford, will not ordinarily restrain state officers from collecting state taxes where state law affords an adequate remedy to the taxpayer. Matthews v. Rodgers, 284 U.S. 521 [52 S.Ct. 217, 76 L.Ed. 447. This withholding of extraordinary relief by the courts having authority to give it is not a denial of the jurisdiction which Congress has conferred on the federal courts, or of the settled rule that the measure of inadequacy of the plaintiff's legal remedy is the legal remedy afforded by the federal not the state courts. Stratton v. St. Louis S.W. Ry. Co., 284 U.S. 530, 533-34 [52 S.Ct. 222, 223, 76 L.Ed. 465; DiGiovanni v. Camden Ins. Assn., 296 U.S. 64, 69 [56 S.Ct. 1, 3, 80 L.Ed. 47]. On the contrary, it is but a recognition that the jurisdiction conferred on the federal courts embraces suits in equity as well as at law, and that a federal court of equity, which may in an appropriate case refuse to give its special protection to private rights when the exercise of its jurisdiction would be prejudicial to the public interest (United States v. Dern, 289 U.S. 352, 359-360, 53 S.Ct. 614, 617, 77 L.Ed. 1250; Virginian Ry. Co. v. Federation, 300 U.S. 515, 549-53, 57 S.Ct. 592, 600-02, 81 L.Ed. 789), should stay its hand in the public interest when it reasonably appears that private interests will not suffer. See Pennsylvania v. Williams, 294 U.S. 176, 185, 55 S.Ct. 380, 385, 79 L.Ed. 841 and cases cited therein.
 
 
 24
 It is in the public interest that federal courts of equity should exercise their discretionary power to grant or withhold relief so as to avoid needless obstruction of the domestic policy of the states.
 
 
 25
 "The scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts, and a proper reluctance to interfere by injunction with their fiscal operations, require that such relief should be denied in every case where the asserted federal right may be preserved without it. Whenever the question has been presented, this Court has uniformly held that the mere illegality or unconstitutionality of a state or municipal tax is not in itself a ground for equitable relief in the courts of the United States. If the remedy at law is plain, adequate, and complete, the aggrieved party is left to that remedy in the state courts, from which the cause may be brought to this Court for review if any federal question be involved." Matthews v. Rodgers, supra, [284 U.S. at] 525-26 [52 S.Ct. at 219-20].
 
 
 26
 319 U.S. at 298, 63 S.Ct. at 1073.
 
 
 27
 This reasoning was updated recently in Fair Assessment in Real Estate Ass'n v. McNary, 454 U.S. 100, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981). There, the Court addressed whether an action for damages brought pursuant to 42 U.S.C. Sec. 1983 alleging deprivation of equal protection due to unequal taxation of real property was barred on the basis of comity. In spite of the strong federal policy underlying Sec. 1983 permitting the vindication of constitutional violations by state officials in federal court, the Court concluded that "the principle of comity controls." 454 U.S. at 105, 102 S.Ct. at 180. Accordingly, it held that Sec. 1983 actions seeking damages for unconstitutional application of state or local tax laws could not be maintained in federal court as long as an adequate state remedy was available. Id. at 107, 102 S.Ct. at 181.
 
 
 28
 More significantly, the Court determined that the principle of comity, which predated the Tax Injunction Act, was not restricted by passage of the Act. The Court stated that "[n]either the legislative history of the Act nor that of its precursor, 28 U.S.C. Sec. 1342, suggests that Congress intended that federal-court deference in state tax matters be limited to the actions enumerated in those sections." 454 U.S. at 110, 102 S.Ct. at 183. Consequently, the scope of federal court deference based on principles of comity is substantially broader than that required under the Tax Injunction Act.
 
 
 29
 The Court found it particularly significant that the petitioners' Sec. 1983 action would be no less disruptive of the state's tax system than would the historic equitable efforts to enjoin the collection of taxes. For instance, it noted that petitioners could not recover under Sec. 1983 unless a district court first determined that the defendant's administration of the county tax system violated the petitioner's constitutional rights. "In effect, the district court must first enter a declaratory judgment like that barred in Great Lakes." 454 U.S. at 113, 102 S.Ct. at 184. The Court felt that such a determination would be fully as intrusive as the equitable actions that are barred by principles of comity. Moreover, because under Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), resort to any state remedy is not required before bringing a civil rights action, taxpayers would be able to invoke federal jurisdiction without first permitting the State to rectify any alleged impropriety. Id. at 114, 102 S.Ct. at 185.
 
 
 30
 In addition to the intrusiveness of the judgment, the Court felt that the very maintenance of the suit itself would intrude on the enforcement of the state scheme:
 
 
 31
 "To allow such suits would cause disruption of the states' revenue collection systems equal to that caused by anticipatory relief. State tax collection officials could be summoned into federal court to defend their assessments against claims for refunds as well as prayers for punitive damages, merely on the assertion that the tax collected was willfully and maliciously discriminatory against a certain type of property. Allowance of such claims would result in this Court being a source of appellate review of all state property tax classifications."
 
 
 32
 Id. (quoting with approval the district court's opinion at 478 F.Supp. 1231, 1233-34 (E.D.Mo.1979)). This intrusion was highlighted in Fair Assessment by the particular facts of the case. First, named as defendants were virtually every key tax official in the county. In addition, the actions which were challenged in the complaint--unequal assessment of new and old property and retaliatory assessment of property belonging to those who successfully appealed to the Board of Equalization--could be the result of policies or practicalities beyond the control of any individual officer, i.e., from a practical allocation of limited resources. Finally, a judicial determination of official liability for the acts complained of would have an undeniable chilling effect upon the actions of all county officers governed by the same practicalities or required to implement the same policies. Such a chilling effect would result not only from the possibility of collecting damages from officials found to have acted in violation of known constitutional rights, but also from the availability of attorney fees under 42 U.S.C. Sec. 1988. In short, the Court found that petitioners' action would "in every practical sense operate to suspend collection of the state taxes...." Great Lakes, 319 U.S. at 299, 63 S.Ct. at 1073. The Court previously rejected this form of federal court interference on principles of federalism. 454 U.S. at 114-15, 102 S.Ct. at 185.
 
 The Court ultimately held that the
 
 33
 [r]ecovery of damages under the Civil Rights Act first requires a "declaration" or determination of the unconstitutionality of a state tax scheme that would halt its operation. And damages actions, no less than actions for an injunction, would hale state officers into federal court every time a taxpayer alleged the requisite elements of a Sec. 1983 claim. We consider such interference to be contrary to "[t]he scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts." Matthews, 284 U.S. at 525 [52 S.Ct. at 219.]
 
 
 34
 Therefore, despite the ready access to federal courts provided by Monroe and its progeny, we hold that taxpayers are barred by the principle of comity from asserting Sec. 1983 actions against the validity of state tax systems in federal courts. Such taxpayers must seek protection of their federal rights by state remedies, provided of course that those remedies are plain, adequate, and complete, and may ultimately seek review of the state decisions in this Court.
 
 
 35
 454 U.S. at 115-16, 102 S.Ct. at 186.
 
 
 36
 Once again, relying on the Hargrave line of cases, respondents argue that the action brought in the district court would not impede state tax collections in any way, and thus is not barred by the doctrine of comity as enunciated in Great Lakes and Fair Assessment. Respondents assert that their claim is actually a benefit to state authorities, since it seeks to enhance tax collections.[4] We must disagree, primarily because we find the reasoning of Hargrave of questionable merit, especially as it relates to the application of principles of comity.
 
 
 37
 First, we would note, that while other courts have adopted the Hargrave distinction in relation to the comity inquiry, see Appling County v. Municipal Elec. Auth., 621 F.2d 1301, 1304 (5th Cir.), cert. denied, 449 U.S. 1015, 101 S.Ct. 574, 66 L.Ed.2d 474 (1980), the Hargrave court itself did not address that question, and indeed, expressed doubt about the propriety of federal court interference in state tax matters, stating:
 
 
 38
 Our holding here in no way intimates an opinion upon the question of whether the federal courts, in the exercise of their discretion, should take jurisdiction of this claim. We merely decide that Congress has not expressly rendered the federal judiciary incompetent to adjudicate this dispute. We note that serious questions of federalism inhere in this claim for relief.
 
 413 F.2d at 327.[5]
 
 39
 Second, while ultimately respondents claim they seek to force the collection of additional taxes, the interference by the federal courts into the state tax system is the same in degree and kind as a suit seeking to enjoin a state tax; and the expense to the state in defending the action is identical. Accordingly, we find the Hargrave distinction, at least under these circumstances, unpersuasive.
 
 
 40
 In fact, it appears clear that the factors which led the Court in Fair Assessment to hold that a Sec. 1983 claim for damages could not be maintained compels a like result in respondents' case. Initially, it is noteworthy that the district court would be forced to issue a declaratory judgment finding that virtually all property owners in the state of Kentucky had been deprived of their right to equal protection under the United States Constitution by the manner in which petitioners administered the state tax system. While respondents insist that such a ruling would work no damage to the fiscal system of the state--since the remedy would be reassessment of those who have been underassessed, rather than refunds to respondents--we cannot logically conclude that no harm would result from a ruling that property assessments have been unconstitutionally administered for years. As stated in Perez v. Ledesma:
 
 
 41
 The special reasons justifying the policy of federal noninterference with state tax collection are obvious. The procedures for mass assessment and collection of state taxes and for administration and adjudication of taxpayers' disputes with tax officials are generally complex and necessarily designed to operate according to established rules. State tax agencies are organized to discharge their responsibilities in accordance with the state procedures. If federal declaratory relief were available to test state tax assessments, state tax administration might be thrown into disarray, and taxpayers might escape the ordinary procedural reguirements imposed by state law. During the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer insolvency. Moreover, federal constitutional issues are likely to turn on questions of state tax law, which, like issues of state regulatory law, are more properly heard in the state courts.
 
 
 42
 401 U.S. 82, 128 n. 17, 91 S.Ct. 674, 698 n. 17, 27 L.Ed.2d 701 (1971) (Brennan, J., concurring in part and dissenting in part) (emphasis added).
 
 
 43
 Next, as in Fair Assessment, the very maintenance of respondents' suit unduly intrudes on administration of the State's tax system. Every county property valuation administrator is named as a defendant in Nowak. And like Fair Assessment, the policies complained of by respondents could well be beyond the control of any of those defendants. Respondents themselves have demonstrated this latter circumstance by the allegations in their complaint. For instance, respondents identify the factors contributing to the alleged systematic underassessment of taxable property owned by coal, oil, and gas interests as: 1) property valuation administrators lack the competence and/or training to properly assess property held by coal, oil, and gas interests; 2) property valuation administrators lack the staff and resources to properly assess property held by coal, oil, and gas interests; 3) property valuation administrators underassess property held by coal, oil, and gas interests because it is politically expedient for them to do so; 4) property valuation administrators do not systematically use available sales or market data to value property held by coal, oil, and gas interests, nor do they systematically use such data to verify the accuracy of the valuations reported to them by coal, oil, and gas interests; 5) property valuation administrators have not been required to conduct revaluations of property held by coal, oil, and gas interests; 6) the Kentucky Legislature has granted unmined coal a de facto exemption from property taxation by lowering the tax on unmined coal to a rate so low that it is uneconomical and impractical to collect the tax; 7) the Secretary of Revenue does not provide property valuation administrators with sufficient technical assistance to enable them to properly assess property held by coal, oil, and gas interests; 8) the Secretary of Revenue's supervision of property valuation administrators is inadequate to assure that they will assess property held by coal, oil, and gas interests at its fair cash value; and 9) the Secretary of Revenue permits property valuation administrators to systematically underassess property held by coal, oil, and gas interests because it is politically expedient for him to do so. The nature of some of these allegations, i.e., limited resources and supervision, suggest that a district court should be reluctant to tread into this area.
 
 
 44
 The facts alleged by respondents also illustrate the fallacy of their contention that the state fisc will not be adversely affected by their action. Although respondents have not expressly prayed for damages, they are seeking costs and attorney fees under 42 U.S.C. Sec. 1988. Likewise, the costs to the State in trying the case will be substantial. Moreover, if respondents were to succeed on their claim, the cost of the relief they seek, including injunctive relief requiring petitioners to reassess all real and personal property owned by coal, oil, and gas interests, will be considerable. In addition, state resources and personnel will be diverted to accomplish that relief. In short, respondents' action would be fully as intrusive as the Sec. 1983 damage action barred by the Court in Fair Assessment.
 
 
 45
 For these reasons, we believe that the principles of comity dictate that a federal court should not intrude into the state tax system and certainly not to the degree that a claim such as respondents' would require. As long as an adequate state remedy exists, taxpayers like respondents should utilize that remedy.
 
 IV.
 Available State Remedies
 
 46
 Respondents' claim would not be barred by the principle of comity if no "plain, adequate and complete" state remedy were available.[6] Fair Assessment, 454 U.S. at 116, 102 S.Ct. at 186. This phrase refers to the obvious precept that plaintiffs seeking protection of federal rights in federal courts should be remitted to their state remedies if their federal rights will not thereby be lost. Id. at 116 n. 8, 102 S.Ct. at 186 n. 8. The state remedies are plain, adequate, and complete[7] if they provide the taxpayer with a full hearing and judicial determination at which the taxpayer may raise any federal constitutional objections to the tax. Rosewell, 450 U.S. at 514, 101 S.Ct. at 1229.
 
 
 47
 Respondents insist that no adequate state remedy is available to them. First, respondents contend that because the resolution of their case turns primarily upon questions of fact, they would not be free to litigate in the Kentucky courts without first exhausting their administrative remedies through the local boards of assessment appeals and the Kentucky Board of Tax Appeals.[8] Under the Kentucky administrative scheme, respondents argue that they would be required to file countless, separate proceedings in the many counties where property owned by coal, oil, and gas interests is located. Respondents conclude that the vast number of separate proceedings they would need to initiate, as well as the resulting duplication of effort and tremendous expense, renders their state remedies both inefficient and inadequate under prevailing law, citing Georgia R.R. and Banking Co. v. Redwine, 342 U.S. 299, 72 S.Ct. 321, 96 L.Ed. 335 (1952) (where remedy "would require the filing of over 300 separate claims in 14 different counties to protect the single federal claim asserted by [the taxpayer]" it is inadequate).
 
 
 48
 While normally third parties are not free to challenge tax assessments of others, respondents point to a provision of Kentucky law which they claim provides a remedy which they would be required to exhaust. Ky.Rev.Stat. Sec. 133.120(1) provides in pertinent part:
 
 
 49
 Any property owner who has listed his property with the property evaluation administrator at its fair cash value likewise may ask the county board of assessment appeals to review the assessments of properties he believes to be assessed at less than fair cash value, providing, he specifies, in writing the individual properties for which the review is sought and factual information upon which his request is based; such as, comparable sales or cost data.
 
 
 50
 Respondents contend that they would be forced to file such third-party protests on every coal, oil, and gas property in every county. Next, according to respondents, they would be likewise required to exhaust administrative appellate remedies.
 
 
 51
 We disagree. In Kentucky Bd. of Tax Appeals v. Simpson, 691 S.W.2d 221 (Ky.App.1985), the court held that third-party protesters under Sec. 133.120(1) were not "aggrieved parties" who could appeal an adverse local decision to the board of tax appeals. Merely asking for review under Sec. 133.120(1), the court held, gives third-party protesters no rights "beyond bringing the fact of low assessments to light. It affords the property valuation administrator an opportunity to correct an inequity or it may expose favoritism if that be the circumstance." 691 S.W.2d at 223-24. The court made clear that the only right conferred upon third-party protesters was the initial local review, and that plaintiffs had no standing to seek any further review of the action taken by the local board.
 
 
 52
 Accordingly, respondents' contention that they would have to pursue this third-party remedy, and then appeal an adverse decision, is without merit. First, they clearly have no appellate procedure available to them. Secondly, the third-party protest procedure is no remedy at all; it is simply a method of bringing underassessments to light. We cannot perceive how the Kentucky courts could require exhaustion of this procedure when it provides no remedy.
 
 
 53
 Furthermore, even if the third-party protester "remedy" would normally have to be exhausted, Kentucky courts have not required exhaustion of administrative remedies when a constitutional challenge is presented. In International Soc'y for Krishna Consciousness v. Commonwealth, 610 S.W.2d 910 (Ky.App.1980), plaintiffs challenged the assessment of a retail sales tax on their activities of proselytizing and alms/donation solicitation as violative of the free exercise clause of the first amendment. The court held that plaintiffs' failure to protest the assessment through the administrative process did not foreclose judicial review, since exhaustion is not required when the constitutionality of an assessment is challenged. Id. at 912.
 
 
 54
 This holding was reaffirmed in Dolan v. Land, 667 S.W.2d 684 (Ky.1984), where plaintiffs challenged the method employed by the Fayette County property valuation administrator in assessing agricultural and horticultural land as unconstitutional. The supreme court affirmed the lower court's holding that the method employed did violate the Kentucky Constitution, and excused plaintiffs' failure to exhaust administrative remedies because the constitutionality of the assessment method was challenged. Id. at 688.
 
 
 55
 Respondents assert, however, that the exhaustion exception for constitutional challenges is not available to them. They contend that their claim is a constitutional challenge only in the sense that the Kentucky Constitution requires all property in the state to be taxed at fair cash value. Ky. Const. Sec. 172. Because the whole system of administrative remedies created by Kentucky law is designed precisely for this type of challenge, respondents conclude that if their claim fell within the constitutional question exception to the exhaustion requirement under Kentucky law, then all Kentucky taxpayers who challenge their assessments would be included within the exception.
 
 
 56
 We agree that if respondents' claim simply alleged denial of the right to have land assessed at fair market value in accordance with the Kentucky Constitution, it would not present the type of constitutional challenge excepted from exhaustion requirements as recognized in International Soc'y for Krishna Consciousness and Dolan. But this argument neatly ignores the federal constitutional challenge--denial of equal protection under the fourteenth amendment--on which respondents have founded their entire case. It is this aspect of their case that places it within the constitutional challenge exception to administrative exhaustion rules.
 
 
 57
 Respondents also attempt to distinguish Dolan, by asserting that it concerned the constitutionality of a specific method of assessment, in contrast to respondents' case, which entails an attack on particular assessments. Thus, respondents submit, they would be required to exhaust administrative remedies in relation to each of those particular assessments. Again, we find this argument without merit. Respondents simply cannot have it both ways. They cannot assert that this is only an attack on particular assessments and at the same time invoke federal jurisdiction under the equal protection clause. If respondents wish their case to be characterized as simply an attack on particular assessments, then this is not an equal protection claim, the court is without jurisdiction, and respondents have no standing to challenge those assessments.
 
 
 58
 Our review of Kentucky law convinces us that respondents have a state remedy which is "plain, adequate and complete." Fair Assessment, 454 U.S. at 116 n. 8, 102 S.Ct. at 186 n. 8. No administrative remedy exists to be exhausted. Even if the third-party protester provision is required to be "exhausted," since this case presents a constitutional challenge, such requirement would be excused. Kentucky courts have shown no reluctance in remedying constitutional violations when found. See, e.g., Russman v. Luckett, 391 S.W.2d 694 (Ky.1965).
 
 V.
 Whether the Writ Should Issue
 
 59
 We must still address whether this case is appropriate for the extraordinary remedy of mandamus, which will be granted only when a petitioner shows that "its right to issuance of the writ is 'clear and indisputable.' " In re Post-Newsweek Stations, Michigan, Inc., 722 F.2d 325, 329 (6th Cir.1983) (quoting Bankers Life & Casualty Co. v. Holland, 346 U.S. 379, 384, 74 S.Ct. 145, 148, 98 L.Ed. 106 (1953)). While this court clearly has the power to issue a writ of mandamus pursuant to 28 U.S.C. Sec. 1651, petitioners bear a heavy burden in showing that mandamus is the proper remedy. In re Bendectin Products Liability Litigation, 749 F.2d 300, 303 (6th Cir.1984).
 
 
 60
 In In Re Bendectin, we analyzed the propriety of granting the writ by using guidelines developed by the Ninth Circuit in Bauman v. United States District Court, 557 F.2d 650, 654 (9th Cir.1977). Those guidelines, based upon an extensive review of applicable Supreme Court and Ninth Circuit case law, are:
 
 
 61
 (1) The party seeking the writ has no other adequate means, such as direct appeal, to attain the relief desired.
 
 
 62
 (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal. (This guideline is closely related to the first).
 
 
 63
 (3) The district court's order is clearly erroneous as a matter of law.
 
 
 64
 (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules.
 
 
 65
 (5) The district court's order raises new and important problems, or issues of law of first impression.
 
 
 66
 749 F.2d at 304.
 
 
 67
 As the Bauman court recognized, however, the "guidelines are cumulative and may not all point to the same conclusion." 557 F.2d at 655. "Rarely if ever will a case arise where all the guidelines point in the same direction or even where each guideline is relevant or applicable." Id. In many cases, "a proper disposition will often require a balancing of conflicting factors." Id.
 
 
 68
 At least three of the Bauman factors counsel strongly in favor of issuance of the writ. First, it is clear that by the time petitioners have the right to appeal the adverse ruling, much of the damage will have been done. The trial court refused to certify an interlocutory appeal under 28 U.S.C. Sec. 1292(b), although recognizing that the issue sought to be certified was controlling, and that there was substantial ground for difference of opinion on the issue. Consequently, there is no other remedy which would avert the necessity of trial on the merits.
 
 
 69
 The second factor, which as noted relates closely to the first, recognizes that the damage to be avoided is the intrusiveness of the trial itself, along with the danger that the administration of the state tax scheme will be declared unconstitutional. Our previous discussion of comity aptly illustrates the reasons for avoiding such a result. Needless to say, any damage will have already occurred by the time an appeal is taken.
 
 
 70
 In addition, we believe that the district court's order denying petitioners' motion to dismiss is clearly erroneous as a matter of law. The district court's reliance on Hargrave was in error, as we question the correctness of that decision. And the court wholly failed to consider whether adequate state remedies were available to respondents. Based upon the Supreme Court's broad pronouncements in cases like Fair Assessment, we conclude the district court's decision was clearly erroneous. Consequently, the third Bauman factor militates in favor of granting the writ.
 
 
 71
 The fourth and fifth guidelines in Bauman have little or no applicability. While the issues raised by the district court's order seldom arise, they are not issues of first impression. These factors do not exercise any influence on whether the writ should issue.
 
 
 72
 Accordingly, we find that the issuance of a writ of mandamus directing the district court to dismiss the complaint is appropriate in this unusual case. Consequently, we need not reach petitioners' other jurisdictional challenge. The petition is GRANTED and the writ shall ISSUE.
 
 
 73
 NATHANIEL R. JONES, Circuit Judge, concurring.
 
 
 74
 I join the majority in finding that Kentucky's administrative remedy is adequate, however, I do so only because respondents are exempt from the heavy burden Kentucky places on challengers to its property assessment system. Respondents' claim falls within the constitutional challenge exception of Kentucky's administrative exhaustion rule, therefore they are exempt from Kentucky's requirement that administrative remedies be exhausted before state judicial review becomes available. See International Soc. for Krishna Consciousness v. Commonwealth, 610 S.W.2d 910, 912 (Ky.Ct.App.1980). If it were not for this exception, I do not see how Kentucky would meet the "plain, adequate and complete" standard expressed in Fair Assessment in Real Estate Assn. v. McNary, 454 U.S. 100, 116, 102 S.Ct. 177, 186, 70 L.Ed.2d 271 (1981). See Georgia Railroad & Banking Co. v. Redwine, 342 U.S. 299, 72 S.Ct. 321, 96 L.Ed. 335 (1952) (a remedy that "would require the filing of over 300 separate claims in fourteen different counties to protect the single claim asserted by [the taxpayer]" was deemed inadequate).
 
 
 75
 Since we are deciding this case on the grounds that respondents' claim is an exception, I would not reach the question of choosing between attacking particular assessments and invoking federal jurisdiction under the equal protection clause.
 
 
 
 [1]
 Petitioners do not raise their eleventh amendment immunity argument on appeal
 
 
 [2]
 The legislative history referred to by the Hargrave court is consistent with that discussed in our opinion in Aluminum Co. v. Department of Treasury, 522 F.2d 1120 (6th Cir.1975):
 The committee reports reflect two main purposes and two secondary purposes underlying Sec. 1341. First, the Act is aimed at eliminating the discriminatory effect on State citizens, who are limited to State agencies and courts in settling their State tax disputes, of allowing foreign corporations to take State tax disputes into federal courts as well as allowing them access to State Courts....
 The Act's second main purpose is to eliminate disruption of State financing efforts by foreign corporations. The Senate Report noted it was then common practice * * * for foreign corporations doing business in such States to withhold from them and their governmental subdivisions taxes in such vast amounts and for such long periods of time as to seriously disrupt State and county finances. The pressing needs of these States for this tax money is so great that in many instances they have been compelled to compromise these suits, as a result of which substantial portions of the tax have been lost to the States without a judicial examination into the real merits of the controversy.
 Insertions in the Congressional Record which accompany the report of discussion of this measure on the floor of the Senate indicate two secondary reasons behind Sec. 1341. The first is a concern that the added expense of litigating in the federal courts might make it financially unsound for the State or a local taxing authority to contest a wealthy corporation's tax liability. The other is to relieve congestion in the federal courts by letting State courts settle State controversies.
 522 F.2d at 1124 (citing S.Rep. No. 1035, 75th Cong., 1st Sess. 102 (1937), and 81 Cong.Rec. 1416-17 (1937)).
 Nevertheless the Supreme Court has, on other occasions, recognized other purposes behind the Act. "To be sure, in enacting the Tax Injunction Act, Congress considered primarily injunctions against state officials because that form of anticipatory relief was the principal weapon used by businesses to delay or avoid paying state taxes.... Nevertheless, the legislative history of the Tax Injunction Act demonstrates that Congress worried not so much about the form of relief available in the federal courts, as about divesting the federal courts of jurisdiction to interfere with state tax administration." Grace Brethren, 457 U.S. at 409 n. 22, 102 S.Ct. at 2508 n. 22.
 
 
 [3]
 The trial court, in Nowak, so ruled
 
 
 [4]
 In our opinion this proposition misperceives what is being sought by petitioners. They are not really seeking to increase the total taxes raised, but rather are saying that the sum that is being raised should be allocated differently. As the coal, oil and gas properties paid more--the other property owners arguably would pay less
 
 
 [5]
 It is interesting to note that on remand, a three-judge district court declined to dismiss the action on Great Lakes comity grounds. One of the arguments urged by defendants but rejected by the court was that there was a similar attack pending in the state courts, which raised state constitutional arguments. Hargrave v. Kirk, 313 F.Supp. 944, 947 (M.D.Fla.1970). On direct appeal the Supreme Court vacated and remanded, holding that the pending state case might have resolved the issues under the state constitution and thus "obviate the necessity of determining the fourteenth amendment question." Askew v. Hargrave, 401 U.S. 476, 478, 91 S.Ct. 856, 858, 28 L.Ed.2d 196 (1971) (per curiam)
 
 
 [6]
 The district court failed to address this issue
 
 
 [7]
 While Rosewell was a decision based on the Tax Injunction Act, and interpreted the Act's requirement of a "plain, speedy and efficient remedy," in Fair Assessment the Court stated that no significant difference existed between the two phrases. 454 U.S. at 116 n. 8, 102 S.Ct. at 186 n. 8
 
 
 [8]
 Kentucky tax law provides a two-tiered system of administrative review. Local boards of assessment appeals hear challenges to property assessments in their counties in the first instance. Ky.Rev.Stat. Sec. 133.120. Decisions of the local boards may be appealed to the Kentucky Board of Tax Appeals. Id. Sec. 131.340. When such an appeal is taken, the proceedings before the board are de novo. Id. Sec. 131.345. Parties aggrieved by a decision of the Kentucky Board of Tax Appeals may take appeals to the circuit court in the county where the proceedings originated. Id. Sec. 131.370(1). Any final orders may be appealed to the court of appeals. Id. Sec. 131.370(5)