307 F.3d 1011
 Kathleen M. WINN, an Arizona taxpayer; Diane Wolfthal, Arizona taxpayer; Maurice Wolfthal, Arizona taxpayer; Lynn Hoffman, an Arizona taxpayer, Plaintiffs-Appellants,
v.
Mark W. KILLIAN, in his official capacity as Director of the Arizona Department of Revenue, Defendant-Appellee.
 No. 01-15901.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 11, 2002.
 Filed October 3, 2002.
 
 COPYRIGHT MATERIAL OMITTED Paul Bender, Arizona State University College of Law, Phoenix, AZ, and Marvin S. Cohen, and Isabel M. Humphrey, Sacks Tierney P.A., Scottsdale, AZ, for the plaintiffs-appellants.
 Patrick Irvine, Deputy Attorney General, Phoenix, AZ, Joseph A. Kanefield, Asst. Attorney General, Phoenix, AZ, for the defendant-appellee.
 Appeal from the United States District Court for the District of Arizona; Earl H. Carroll, District Judge, Presiding. D.C. No. CV-00-00287-EHC.
 Before: SCHROEDER, Chief Judge, D.W. NELSON and REINHARDT, Circuit Judges.
 REINHARDT, Circuit Judge.
 
 
 1
 This case raises the question of when the federal courts may entertain constitutional challenges to state tax laws. Appellants, who are Arizona residents and taxpayers, contend that an Arizona statute permitting tax credits for contributions that support parochial schools violates the Establishment Clause. The district court granted the state's motion to dismiss on the basis that the Tax Injunction Act divests the federal courts of subject matter jurisdiction in this case, and on the basis of general principles of comity and federalism. Neither the statute nor the doctrines relied on by the district court bar Appellants' action. Because Appellants do not challenge any of the types of procedures specified in the Tax Injunction Act, and because they seek to enjoin the granting of a tax credit, rather than the collection of state revenue, the action is justiciable in federal court.
 
 I. BACKGROUND
 
 2
 The statute at issue in this case is Arizona Revised Statute § 43-1089 (hereinafter "§ 1089"). Enacted in 1997, the law permits state tax credits for contributions to organizations called "school tuition organizations." ("STOs"). Section 1089 provides that STOs must be charitable organizations under § 501(c)(3) of the Internal Revenue Code. The tax credit program works as follows: Each Arizona taxpayer may receive a tax credit of up to $500 for the amount of voluntary contributions he or she makes to STOs in any single year; married couples filing jointly may receive a credit of up to $625. § 1089(A)(1)-(2).
 
 
 3
 There are several limits on the activities of STOs. The organizations are required to spend at least 90% of their revenue on educational scholarships or grants for children in order to allow those children to attend a private school, including parochial schools. § 1089(E)(3). An STO is not permitted to dispense all of its scholarships or grants to students attending the same school; the statute provides that recipients of an STO's funds must be drawn from at least two different schools. Id. A taxpayer cannot request that a contribution to an STO be used for the direct benefit of his dependent. § 1089(D). Finally, an STO cannot distribute grants or scholarships to students who attend schools that discriminate on the basis of race, color, handicap, familial status, or national origin. § 1089(E)(2).
 
 
 4
 There are no other limits on how STOs operate; thus, an STO may distribute grants only to students attending Catholic schools, Protestant schools, Muslim schools, Jewish schools, or schools maintained by any other single religious sect. STOs may also limit their grants to children of families who belong to a particular faith — Catholic children, Protestant children, Muslim children, or Jewish children, for example. The total amount of funds available for STO grants (and the concomitant revenue loss to the state) is limited only by the number of taxpayers who elect to contribute, rather than pay the amount of their contributions as taxes.
 
 
 5
 Appellants contend that the tax credit scheme is an impermissible government subsidy of religious schools in violation of the First and Fourteenth Amendments of the Constitution. They point out that under the tax credit system, a substantial amount of money that would otherwise be received by the state and be available for funding public education and other essential public services is diverted to religious institutions to be used for the promulgation of particular religious views. Appellants filed this action in February, 2000, seeking a declaration that the STO program violates the Establishment Clause of the First Amendment; they also requested an injunction both enjoining the future operation of the program, and requiring the return to the state's general fund of monies already distributed to (but not yet expended by) STOs.
 
 
 6
 In their complaint, plaintiffs described how the STO tax scheme has worked in practice:[1] In calendar year 1998, the first full year that the tax credit was in effect, STOs reported to the Arizona Department of Revenue that they had received $1.8 million in contributions. At least 94% of that amount was donated to STOs that restrict their scholarships or grants to students attending religious schools; three religious STOs received 85% of the donations made that year. The principal beneficiary of the funds that otherwise would have been paid to the state as tax revenues was the Catholic Diocese of Phoenix.[2] The program expanded significantly in 1999, its second year of operation; according to plaintiffs, the Catholic Diocese of Phoenix alone received $4.5 million for its STO that year, and the Catholic Diocese of Tucson reported more than $850,000 in donations as a result of the tax scheme.
 
 
 7
 The STO program was challenged in the Arizona courts as soon as it was enacted. The program was upheld as constitutional by the Arizona Supreme Court, in a 3-2 decision. Kotterman v. Killian, 193 Ariz. 273, 972 P.2d 606, cert. denied, 528 U.S. 921, 120 S.Ct. 283, 145 L.Ed.2d 237 (1999). Plaintiffs assert that principles of res judicata do not bar the instant action, and defendants have not raised a res judicata, defense either here or in the district court.
 
 
 8
 Arizona[3] moved to dismiss the complaint on two grounds: (1) on the basis of Eleventh Amendment immunity; and (2) on the basis of a lack of subject matter jurisdiction resulting from the Tax Injunction Act, 28 U.S.C. § 1341, as well as from principles of comity. Simultaneously, a number of parties sought intervention in the lawsuit. The district court granted the motion to dismiss on the ground that the Tax Injunction Act as well as comity preclude federal jurisdiction over plaintiffs' claim; it did not rule on either the motions to intervene or the Eleventh Amendment argument. A timely appeal was filed.
 
 II. DISCUSSION
 A. Tax Injunction Act
 
 9
 The Tax Injunction Act precludes district courts from interfering with a state's "assessment, levy, or collection" of state taxes where an efficient remedy is available in state court.[4] Arizona does not contend that any relief that the district court might order in this case would interfere with a "levy" or "collection" of any taxes. Rather, it asserts that the Tax Injunction Act bars this action because the STO tax credit is part of Arizona's general system of tax "assessment." In other words, according to Arizona, the tax credit is part of the overall calculus by which the state determines how much revenue it will receive from each taxpayer. This broad reading of the word "assessment," however, is supported neither by any precedent interpreting "assessment" in this manner, nor by the meaning of the word itself. The term "assessment" has two definitions relevant to the question presented in this case: (1) "to estimate officially the value of (property, income, etc.) as a basis for taxation," and (2) "to impose a tax or other charge on." RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 90 (1979). Neither definition of the term describes the role of the STO tax credit in the Arizona tax system: (1) the STO credit available to a taxpayer is a uniform amount that is applied to the calculation of taxes after a taxpayer's gross income has been determined and therefore plays no part in the "assessment" of property or income as a basis for the imposition of taxes,[5] and (2) the challenged practice is not the imposition of a tax; quite the contrary, it is the grant of a benefit in the form of an excuse from paying a portion of the taxes already assessed.
 
 
 10
 The district court agreed with Arizona's contention that the STO credit constitutes a "tax assessment," and that this action is consequently barred. It stated that Blangeres v. Burlington Northern, Inc., 872 F.2d 327, 328 (9th Cir.1989), compelled its conclusion. Blangeres, however, involved a federal lawsuit in which individuals sought to prevent a company from disclosing documents that were necessary to the state's valuation of certain taxable assets belonging to a corporation. Thus, the suit affected the state's ability to determine the value of a taxpaying entity's taxable income, or to "assess" the assets as the term is defined in the first of the two definitions set forth above. In short, Blangeres held that a lawsuit challenging the methods by which the state obtains information used for the valuation of taxable property is barred by the Tax Injunction Act, because any relief would prevent the state from accurately assessing taxes. Blangeres does not support defendant's argument here.
 
 
 11
 Moreover, if plaintiffs were to receive the relief that they seek in this action, there would be no violation of the purposes or policy underlying the Tax Injunction Act. Congress sought to implement two purposes when it passed the Act in 1937. They are well-documented in both the legislative record and in subsequent cases. See, e.g., Aluminum Co. v. Department of Treasury, 522 F.2d 1120, 1124 (6th Cir. 1975); Hargrave v. McKinney, 413 F.2d 320, 326 (5th Cir.1969). The first purpose, which is not relevant to the instant appeal, involves the discriminatory effect of diversity jurisdiction in tax cases.[6]
 
 
 12
 The second, more relevant purpose was to prevent disruption of a state's efforts to collect tax revenues. That concern is clearly expressed in the committee reports prepared when the Act was under consideration in Congress:
 
 
 13
 The existing practice of the Federal courts in entertaining tax-injunction suits against State officers makes it possible for foreign corporations doing business in such States to withhold from them and their governmental subdivisions, taxes in such vast amounts and for such long periods of time as to seriously disrupt state and county finances. The pressing needs of these States for this tax money is so great that in many instances they have been compelled to compromise these suits, as a result of which substantial portions of the tax have been lost to the States without a judicial examination into the real merits of the controversy.
 
 
 14
 S.Rep. No. 1035, 75th Cong., 1st Sess. 2 (1937). See also Rosewell v. LaSalle Nat'l Bank, 450 U.S. 503, 527, 101 S.Ct. 1221, 67 L.Ed.2d 464 (1981) (explaining that if injunctive relief prohibiting the collection of a state tax was available, then "during the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer insolvency."); RICHARD H. FALLON, ET AL, HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM, 1216-17 (4th ed. 1996) (In passing the Tax Injunction Act, Congress was "concerned that taxpayers, with the aid of a federal injunction, could withhold large sums, thereby disrupting governmental finances.").
 
 
 15
 We have not previously addressed the scope of the Tax Injunction Act with respect to suits challenging tax credits. We have, however, recognized on a number of occasions that a fundamental concern of the Act is ensuring that state coffers do not become bare as a result of federal court injunctive action. For instance, in Dillon v. State of Montana, 634 F.2d 463 (9th Cir.1980), we held that a refund action was barred by the Tax Injunction Act because a federal court order requiring a state to grant a tax refund is functionally equivalent to an order preventing the collection of taxes. When determining whether federal court injunctive action is permissible under the Act, Dillon stated that a federal court is to look at "[t]he practical effect on state fiscal operations" of the federal court order that plaintiffs seek. Id. at 466. See also Poer & Co., et al. v. Counties of Alameda, et al., 725 F.2d 1234, 1235 (9th Cir.1984) (holding that jurisdiction does not exist to entertain an action for an injunction that would result in a tax refund). We applied the same "practical" approach in Bidart Brothers v. California Apple Commission, 73 F.3d 925, 930 (9th Cir.1996), in which we held that certain state agency fees did not constitute "taxes" for purposes of the Act, principally because they were not "assessments that if enjoined would threaten the flow of central revenues of state governments...."
 
 
 16
 Applying that functional analysis here, we hold that a federal action challenging the granting of a state tax credit is not prohibited by the Tax Injunction Act. The invalidation of a tax credit, such as the one at issue here, does not adversely affect the state's ability to raise revenue. If the STO tax scheme were to be struck down on Establishment Clause grounds, Arizona's ability to raise revenue would not be diminished; to the contrary, it would be enhanced. Thus, if the district court were ultimately to rule for the plaintiffs on the merits, the Act's primary policy of non-interference with state revenue collection would not be undermined in any way.
 
 
 17
 Arizona essentially argues that the Tax Injunction Act bars any federal litigation regarding the constitutionality of state taxes. Even if the STO tax credit is not an assessment, Arizona argues, the Tax Injunction Act's general policy of non-interference with state tax matters counsels against allowing this action to proceed. Such a broad reading of the Act is inconsistent with our precedent, the language of the Act, the legislative purpose set forth above, and the federal courts' role as "guardians of the people's federal rights." Mitchum v. Foster, 407 U.S. 225, 242, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).
 
 
 18
 We agree with the interpretation of the Tax Injunction Act adopted by the Seventh Circuit. That court, like ours, applies a searching analysis of the effect of federal litigation on the state's ability to collect revenues, and will only bar the adjudication of a federal constitutional claim in federal court if a judgment for the plaintiffs will hamper a state's ability to raise revenue. Dunn v. Carey, 808 F.2d 555 (7th Cir.1986).[7] In Dunn, the plaintiffs' requested relief, as here, would have resulted in the state's collecting more tax revenue than it would have otherwise. The Seventh Circuit held that for that reason the action was not barred by the Tax Injunction Act, and rejected a broad interpretation of the Act that would govern "any federal litigation touching on the subject of state taxes." Id. at 558. Dunn continued: "[t]he text of [the Act] does not suggest that federal courts should tread lightly in issuing orders that might allow local governments to raise additional taxes." Id. The same holds true here where Appellants' requested relief would result in the elimination of a tax credit — and, accordingly, produce more revenues for Arizona.[8]
 
 
 19
 In sum, we hold that because plaintiffs attack the grant of a tax credit, which is not one of the three types of state tax procedures barred from challenge in federal court by the Tax Injunction Act, the district court erred in dismissing the action pursuant to that Act. Equally important, the relief requested by plaintiffs in this action would not hinder Arizona in its ability to impose taxes or collect revenue, but in fact would result in the state's receiving more funds that could be used for the public benefit. The Tax Injunction Act does not preclude federal courts from taking actions designed to increase the revenues available to the states, nor to remove unconstitutional barriers to the states' collection of the full amount of taxes they have levied or assessed.
 
 B. Comity
 
 20
 The district court held as an alternative ground for its dismissal of this action that principles of comity preclude lawsuits involving potential federal court interference in the administration of state tax systems. The district court held that a federal court action that disrupts the domestic tax policy of a state is barred by principles of comity, regardless of whether the action relates to the collection of taxes, to tax deductions, or to tax credits. This broad bar to the litigation of federal constitutional claims in federal court is unsupported by precedent, and we reject it.
 
 
 21
 The Supreme Court has twice held federal jurisdiction to be barred by the doctrine of comity in cases in which state tax measures were challenged. Both, however, are cases in which the plaintiffs sought to stop the collection of a tax; thus, they are fundamentally different from the instant case.
 
 
 22
 In the first, Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943), the plaintiffs challenged a Louisiana tax on dormant commerce clause grounds, and sought a declaration that it was invalid. Although the then-newly-passed Tax Injunction Act only bars injunctive relief by federal courts, the Supreme Court held that the Act merely codified preexisting principles of comity that prevent interference with the states' collection of revenue. Thus, comity required the dismissal of the declaratory judgment action for the same reason the Tax Injunction Act was enacted. Id. at 297, 63 S.Ct. 1070. "[T]he federal courts, in the exercise of the sound discretion which has traditionally guided courts of equity in granting or withholding the extraordinary relief which they may afford, will not ordinarily restrain state officers from collecting state taxes where state law affords an adequate remedy to the taxpayer." Id. (citing Matthews v. Rodgers, 284 U.S. 521, 52 S.Ct. 217, 76 L.Ed. 447 (1932)) (emphasis added).
 
 
 23
 Arizona cites isolated statements from Great Lakes in support of its broad theory of comity. Such dicta is of limited significance. For instance, it is true that in Great Lakes, the Court stated that "[i]t is in the public interest that federal courts of equity should exercise their discretionary power to grant or withhold relief so as to avoid needless obstruction of the domestic policy of the states." Id. at 298, 63 S.Ct. 1070. This statement alone, however, does not warrant expanding the doctrine of comity from precluding actions that affect the ability of states to raise revenue, to precluding all actions that relate to state tax administration, including actions designed to prevent the violation by the states of fundamental First Amendment guarantees. Indeed, the statement on which the state relies is generally applicable to any constitutional challenge to state law in federal court. It is not limited to state tax cases. Surely, the dicta did not mean that federal courts should not protect the constitutional rights of individuals against the implementation of unlawful state policies. Further, the dicta states only that federal courts should not "needless[ly] obstruct" state domestic policies. Ordinarily, however, when the policies that the state is enforcing are unconstitutional, precluding their application is not "needless" but necessary.
 
 
 24
 The second of the Supreme Court's comity cases involving the constitutionality of state tax laws is Fair Assessment in Real Estate Association v. McNary, 454 U.S. 100, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981). There, plaintiffs alleged that a state's property tax assessment procedures did not comport with due process, and sought damages from the tax collectors pursuant to 42 U.S.C. § 1983. The Supreme Court held the suit to be barred by comity principles. Although the action was not directly prohibited by the Tax Injunction Act because plaintiffs sought damages under § 1983 rather than injunctive relief, the Court held that "petitioner's action would `in every practical sense operate to suspend collection of the state taxes....'" Id. at 115, 102 S.Ct. 177(quoting Great Lakes, 319 U.S. at 299, 63 S.Ct. 1070).
 
 
 25
 In McNary, as in Great Lakes, the federal action was dismissed because it would have hindered the state's ability to collect revenue. In particular, the McNary Court expressed concern that a judgment for plaintiffs would have had a significant ripple effect on a number of state tax provisions that depended on the challenged assessment procedure, and would have unduly constrained the activities of state officials implementing that procedure due to the fear of potential liability under § 1983, as well as an aversion to the burden of defending § 1983 actions. In contrast, an ultimate judgment on the merits for plaintiffs here — much less the conduct of this litigation — would have no effect at all on the implementation of any other Arizona tax provisions, nor would it chill the activities of Arizona tax collectors. The STO credit is a limited, discrete portion of the Arizona tax code that, if invalidated, would not substantially affect the administration of taxes in other ways, and would, in fact, produce substantial additional revenue for the state. Although it, like any state statute, expresses the policy views of the state of Arizona, and thus should not be lightly disregarded, in this case Arizona identifies no harm that renders federal court review of this statute any more intrusive on the state's sovereignty than the review of any other state statute that is alleged to be unconstitutional. Accordingly, comity does not bar plaintiffs' attempt to vindicate the important constitutional rights at issue.
 
 CONCLUSION
 
 26
 Because both the Tax Injunction Act and the doctrine of comity, as it has been applied to federal tax cases involving state tax laws, are primarily concerned with federal litigation that interferes with the ability of the states to raise necessary tax revenues, they are inapplicable here. Accordingly, we REVERSE the district court's grant of Arizona's motion to dismiss and REMAND the case for further proceedings.
 
 
 27
 REVERSED and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 Because the district court dismissed the case for lack of jurisdiction pursuant to Rule 12(b)(1), for purposes of this appeal the facts as stated in the complaint must be accepted as trueWilkins v. United States, 279 F.3d 782, 784 n. 1 (9th Cir.2002).
 
 
 [2]
 The largest single recipient in 1998 was the Catholic Tuition Organization of the Diocese of Phoenix, which received $ 837,140 of the $1.8 million in diverted funds. That organization provides tuition assistance to students attending Catholic schools run by the Catholic Diocese of Phoenix. The second largest single recipient was an STO that restricts its grants to students attending evangelical Christian schools. The third was an STO that restricts its grants to Brophy College Preparatory School, a Catholic all-boys' high school, and its sister school, Xavier College Preparatory School for girls
 
 
 [3]
 The nominal defendant in this action is Mark W. Killian, who is sued in his official capacity as Director of the Arizona Department of Revenue. For simplicity, in this opinion we refer to the defendant as "Arizona."
 
 
 [4]
 The Tax Injunction Act provides in its entirety as follows:
 The District Courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under state law where a plain, speedy and efficient remedy may be had in the courts of such state.
 28 U.S.C. § 1341.
 
 
 [5]
 All taxpayers, regardless of their tax bracket or adjusted gross income, may receive up to the standard sums of either $500 or $625 in tax credits for STO contributions (depending on the taxpayer's filing status and the amount of his contributions to STOs). Whatever a taxpayer contributes to an STO is subtracted directly from his tax billafter his income is assessed and his tax liability calculated. From a purely financial perspective, then, a taxpayer is unaffected by his decision as to whether or not to make an STO contribution. The funds that he may contribute will be unavailable to him in any event: they will be used either to make the contribution or to pay the taxes he owes. We note that a tax credit differs from a tax deduction in that where a tax deduction is involved, giving money to a religious institution is not, as is the case of a tax credit, a free gift. In the case of a tax credit, the taxes due are reduced by the full amount of the gift. In contrast, when a taxpayer is entitled to a tax deduction, the taxpayer must in most if not all instances still pay a majority of the tax involved: it is only his taxable income that is reduced by the amount of the gift, and, thus, his tax liability is reduced only by a percentage of the gift that is equal to the tax rate applicable to his income bracket.
 
 
 [6]
 Congress sought to eliminate an advantage that existed for foreign parties: prior to passage of the Act, such individuals or corporations could sue a state for injunctive relief in federal court on the basis of diversity jurisdiction and avoid paying the disputed tax until the challenge was resolved. In contrast, state residents — because they are not diverse — were forced to seek redress only in state courts, which typically required a party to pay a disputed tax first, and challenge it thereafter. S.Rep. No. 1035, 75th Cong., 1st Sess. 1-2 (1937). ("If those to whom the federal courts are open may secure injunctive relief against the collection of taxes, the highly unfair picture is presented of the citizen of the State being required to pay first and then litigate, while those privileged to sue in the federal courts need only pay what they choose and withhold the balance during the period of litigation.")
 
 
 [7]
 We note that the Sixth Circuit inIn Re Gillis, 836 F.2d 1001 (6th Cir.1988), gave a different reading to the Tax Injunction Act. In Gillis, the court stated that if a suit "unduly intrudes on administration of the State's tax system," then it is precluded by the Act. Id. at 1009. In that case, the plaintiffs challenged Kentucky's system of tax assessment of coal, oil, and gas interests, charging that such properties were systematically underassessed for tax purposes. The Gillis plaintiffs contended that their claims were not foreclosed by the Tax Injunction Act because if they prevailed, it would lead to increased tax revenues for the state. The Sixth Circuit rejected this argument, taking a broad view of the scope of the Act's limit on federal court jurisdiction. Nevertheless, despite its broad language, the Sixth Circuit's decision is distinguishable from the case before us, because the court in Gillis was asked to do precisely what the Tax Injunction Act forbids — to interfere with a state's "assessment" of a tax, one of the three state functions specified in § 1341. Here no interference with any of the functions specified in the statute is involved.
 
 
 [8]
 The reported cases factually most similar to this one are two district court cases. InRojas v. Fitch, 928 F.Supp. 155 (D.R.I.1996), affirmed on other grounds, 127 F.3d 184 (1st Cir.1997), the court held that an Establishment Clause challenge to a state tax exemption was not barred by the Tax Injunction Act. It held:
 It is clear from the very text of the statute that it is not applicable in this instance. The present action is not an action to "enjoin, suspend or restrain" the collection of taxes. In fact it is quite the opposite. This is, in essence, an action to compel the State of Rhode Island to collect taxes.
 
 
 [928]
 F.Supp. at 159See also Moton v. Lambert, 508 F.Supp. 367, 368 (N.D.Miss.1981) (plaintiffs' challenge to a tax exemption for racially segregated schools is not barred by the Tax Injunction Act because, if successful, would have the effect of increasing state revenues).