**Guadalupe ROJAS**

v.

**Lawrence FITCH, Individually and in His Capacity as Director of the Rhode Island Department of Employment and Training; The Salvation Army of Rhode Island, Inc., Defendant Intervenor; and Robert Reich, in His Official Capacity as Secretary, United States Department of Labor.**

**Civ. A. No. 94–0483B.**

United States District Court,
D. Rhode Island.

June 7, 1996.

John William Dineen, Yesser, Glasson & Dineen, Providence, RI, for Plaintiff.

Rebecca Tedford Partington, William Kolb, Attorney General's Office, Providence, RI, Everett Samartino, U.S. Attorney's Office, Providence, RI, Scott Glabman, Office of the Solicitor, U.S. Dept. of Labor, Washington, D.C., Gerard Paul Cobleigh, Cobleigh, Watt, Rock & Giacobbe, Warwick, RI, Florence Barber, Cadwalader, Wickersham & Taft, New York City, Patricia Andrews, Providence, RI, for Defendant.

*OPINION*

FRANCIS J. BOYLE, Senior District Judge.

This action is a constitutional challenge to a federal statute and a Rhode Island statute which operate to exempt religious organizations from the payment of Rhode Island State unemployment taxes. Plaintiff claims that the statutes violate the Establishment Clause, and the Equal Protection Clause of the United States Constitution, as well as, Article I, § 3 of the Rhode Island Constitution. Defendants contend that the action should be dismissed from the federal forum pursuant to the Tax Injunction Act and the doctrine of abstention. Federal defendant also contends that plaintiff lacks standing to bring this action against him. In the alternative, defendants argue that the statutes withstand constitutional scrutiny. For the following reasons, the defendants' procedural challenges to this action are rejected. The statutes, however, are found to be constitutional.

## I. BACKGROUND

The Federal Unemployment Tax Act ("FUTA" or "the Act"), 26 U.S.C. §§ 3301–3311, establishes a cooperative federal-state scheme to provide benefits to unemployed workers. The Act requires employers to pay a federal excise tax equal to a percentage of wages paid to "covered" employees, but also entitles them to a credit on contributions paid into federally approved state unemployment compensation programs. 26 U.S.C. §§ 3301, 3302. Prior to 1970, FUTA excluded from the definition of covered employment "service performed in the employ of a religious, charitable, educational, or other [tax exempt] organization." This "exemption" meant that such organizations were not required to pay either federal excise taxes or state unemployment taxes.

In 1970, Congress amended FUTA, requiring state plans to cover employees of non-profit organizations, state hospitals, and state institutions of higher education, thereby eliminating the broad state exemption available to non-profit organizations.[1] *See*

---

1. Although nonprofit organizations are required to be covered by federally approved state unemployment compensation laws, they continue to be exempt from the federal excise tax on wages as

§ 3306(c)(8), excluding services performed for such organizations from the definition of "employment," has not changed.

Employment Security Amendments of 1970, Pub.L. 91–373, § 104(b)(1), 84 Stat. 697. At that same time, however, Congress enacted § 3309(b), exempting from mandatory state coverage a narrow class of religious and educational employees [2] as well as other specifically enumerated services. In 1976, Congress once again amended FUTA, eliminating the blanket state exemption for school employees contained in § 3309(b)(3), but retaining the exemptions for religious employees and other services.

Title 28, chapters 42–44 of the General Laws of Rhode Island comprise the Rhode Island Employment Security Act. The purpose of this act is to provide "for the accumulation of a fund to assist in protecting the public against the ill effects of unemployment ..." R.I.G.L. § 28–42–2. Section 28–42–8 exempts certain types of employment from the requirements of the Employment Security Act. For instance, the statute exempts from coverage some domestic servants, golf caddies, certain insurance brokers and agents, as well as other services. R.I.G.L. § 28–42–8(1), (9) & (11). As pertains specifically to this action, § 28–42–8(4) exempts from Act coverage:

(4) Service performed:

(i) In the employ of:

(A) A church or convention or association of churches or

(B) An organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches ... R.I.G.L. § 28–42–8(4)(I)(A) & (B) (Michie 1995).

Accordingly, religious organizations and churches which qualify as exempt under § 28–42–8(4) are not required to pay an unemployment tax.

The Salvation Army was founded in 1865 as an international religious and charitable organization. A fundamental belief of the Army is that the physical needs of a person must be administered to before that person can truly receive and accept spiritual guidance. Therefore, as part of its religious mission, The Salvation Army conducts rehabilitative programs, maintains shelters for the homeless, soup kitchens, day care centers and provides many other charitable services. The Salvation Army has been deemed a "church" for tax purposes by both the federal government and the government of the State of Rhode Island. In 1955, the Internal Revenue Service ("IRS") determined that The Salvation Army constituted a "church or a convention or association of churches" for purpose of the Internal Revenue Code. Likewise, in 1987 the Rhode Island Department of Employment and Training determined that the Salvation Army was a "church" and thus entitled to an exemption pursuant to § 28–42–8(4)(a).

Plaintiff worked for The Salvation Army in Providence, Rhode Island from 1988 to 1994 with a brief interruption in 1990–91 during which she was employed by Catholic Social Services. During her time with The Salvation Army, she worked as a social case worker. On March 18, 1994, plaintiff was terminated due to "financial constraints."

Approximately one month later, plaintiff filed an application for unemployment insurance benefits with the Rhode Island Department of Employment and Training ("DET"). DET determined that plaintiff was ineligible for unemployment benefits due to the fact that her former employer was exempt under § 28–42–8(4) of the Rhode Island General Laws. Plaintiff appealed, and a hearing was held before a DET referee on May 12, 1994. At that hearing, plaintiff argued that The Salvation Army was not a "church" within the meaning of R.I.G.L. § 28–42–8(4), and that even if it was a church, § 28–42–8(4) was

---

**2.** § 3309(b), at that time, exempted (in part) services performed:

(1) in the employ of (A) a church or convention or association of churches, or (B) an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches;

(2) by a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry or by a member of a religious order in the exercise of duties required by such order;

(3) in the employ of a school which is not an institution of higher education. [ ...] Pub.L. 91–373, § 104(b)(1), 84 Stat. 698.

violative of the First, Fourth and Fifteenth Amendments to the U.S. Constitution and Article I, § 3 of the Rhode Island Constitution.

The referee, in a decision dated June 6, 1994, affirmed the DET's denial stating in part, "claimant's wages are exempt under the provisions of Section 28–42–8(4) of the Employment Security Act [and] cannot be used to establish a valid Employment Security claim." Furthermore, the referee stated that based upon a review of the case law cited by plaintiff, the Rhode Island statute did not violate either the United States Constitution or the Rhode Island Constitution. Plaintiff appealed that decision to the DET Board of Review. In a decision dated August 16, 1994, the Board "approved and confirmed" the referee's decision.

On September 9, 1994, plaintiff initiated this action in the United States District Court for the District of Rhode Island by filing a complaint naming the Director of DET as defendant. In that complaint, plaintiff sought a judgment declaring R.I.G.L. § 28–42–8(4) as violative of the First, Fifth and Fourteenth Amendments to the United States Constitution and Article I, § 3 of the Rhode Island Constitution.

Approximately one week later, plaintiff initiated a similar action in the District Court of the State of Rhode Island. That action, however, has been stayed by agreement of the parties pending a decision in the federal action.

In December of 1994, the Salvation Army moved without objection to intervene in this action on the grounds that it was a party to the DET proceedings and that its exemption under § 28–42–8(4) is at issue. The motion was granted. In March of 1995, plaintiff moved to amend her complaint to add the Secretary of the United States Department of Labor on the grounds that § 3309(b) of FUTA was inextricably connected with the Rhode Island statute in question. This motion was also granted.

## II. ANALYSIS
### A. *Procedural Issues*

1. *Tax Injunction Act.*

 ▮ Defendants first contend that this action should be dismissed from the federal forum under the Tax Injunction Act. This contention, however, is without merit.

The Tax Injunction Act provides:

> The District Courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State. 28 U.S.C. § 1341 (West 1993).

It is clear from the very text of the statute that it is not applicable in this instance. The present action is not an action to "enjoin, suspend or restrain" the collection of taxes. In fact, it is quite the opposite. This is, in essence, an action to compel the State of Rhode Island to collect taxes. *See Moton v. Lambert*, 508 F.Supp. 367, 368 (N.D.Miss. 1981) (plaintiffs action to invalidate tax exemption for racially segregated schools was not enjoined because it was a "demand that taxes be collected and not enjoined").

Defendants rely on the 1982 United States Supreme Court case of *California v. Grace Brethren Church*, 457 U.S. 393, 408, 102 S.Ct. 2498, 2507–08, 73 L.Ed.2d 93 (1982), for their assertion that "the Act also prohibits a district court from issuing a declaratory judgment holding state tax laws unconstitutional." That reliance is misplaced. Justice O'Connor in the majority opinion specifically stated, "Congress' intent in enacting the Tax Injunction Act was to prevent federal-court interference in the *assessment and collection* of state taxes." *Id.* at 411, 102 S.Ct. at 2509 (emphasis added). *Grace Brethren* involved an action initiated by parties seeking a declaratory judgment to *enjoin* state *collection* of unemployment taxes on constitutional grounds. *Id.* at 398, 102 S.Ct. at 2502–03. The Court held that the Act prohibited a federal court from issuing a declaratory judgment holding a state tax law unconstitutional only if it would "in every practical sense operate to suspend collection of taxes." *Id.* at 408, 102 S.Ct. at 2508 (quoting *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 299, 63 S.Ct. 1070, 1073, 87 L.Ed. 1407 (1943).) Accordingly, because this action does not seek to enjoin or suspend the

assessment and collection of taxes, the Tax Injunction Act does not apply.

### 2. *Doctrine of Abstention.*

Defendants also contend that this action should be dismissed from the federal forum under the doctrine of abstention. The abstention doctrine is actually a collection of several legal theories under which a federal court should or may abstain from hearing an action otherwise properly brought in this forum. *See Colorado River Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Thompson v. Magnolia Petroleum Co.,* 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876 (1940). In a classic example of the "lets throw out as many theories as possible and hope one sticks to the wall" approach, defendants have argued that *all five* different theories of abstention are applicable to this case. All five arguments are without merit.

It should be noted initially that the doctrine of abstention "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959). Thus, abstention can only be justified in exceptional circumstances. *Id.* at 188–89, 79 S.Ct. at 1063. Defendants first argue that the *Pullman* abstention doctrine applies to this action. This doctrine requires federal abstention when a state law is unclear and "a state court's resolution . . . would obviate the need for a federal constitutional ruling." *Pustell v. Lynn Public Schools,* 18 F.3d 50, 53 (1st Cir.1994); *see also Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 236–37, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984). In this instance, however, there is no "unclear" state law. The state statute in question is unambiguous. All parties agree as to its meaning, and the only question before this court is whether that connotation is unconstitutional. As the Supreme Court has stated, "federal courts need not abstain on *Pullman* grounds when a state statute is not 'fairly subject to an interpretation which will render unnecessary' adjudication of the federal constitutional question." *Hawaii Housing Authority,* 467 U.S. at 236, 104 S.Ct. at 2327 (quoting *Harman v. Forssenius,* 380 U.S. 528, 535, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965)). Accordingly, the *Pullman* doctrine is not applicable.

Defendants next argue that *Burford* abstention should apply. The *Burford* doctrine applies where "the state has a unified scheme for review of its administrative orders and federal intervention in cases in which diversity is present would have a disruptive effect on the state's efforts to establish a coherent policy on a matter of substantial public concern." 17A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4244 at 86. *Burford* type abstention has been held to be "generally limited to cases in which a federal court decision would 'disrupt a state administrative process . . . or unnecessarily enjoin state officials from executing domestic policies.'" *State Farm Fire & Cas. Co. v. Sweat,* 547 F.Supp. 233, 241 (N.D.Ga.1982) (quoting *Allegheny,* 360 U.S. at 189, 79 S.Ct. at 1063). Neither of these factors are present in this instance. First, plaintiff has exhausted her state administrative remedies without success. Thus, it cannot be said that the present action is interrupting the state administrative process. Secondly, while it could be argued that this is an action to "enjoin state officials from executing a domestic policy," the resolution of such a serious constitutional query can hardly be called "unnecessary." *See Allegheny,* 360 U.S. at 189, 79 S.Ct. at 1063; *Sweat,* 547 F.Supp. at 241. Accordingly, *Burford* type abstention does not apply.

Defendants next argue that abstention is required because a difficult question of state law is involved. Defendants cite to *Thompson v. Magnolia Petroleum Co.,* 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876 (1940), for their assertion that "a federal court must abstain to avoid deciding a difficult question of state law." This argument is completely without merit. First, *Thompson* does not

stand for such a broad-based assertion. Secondly, even if it did, this action does not involve only a question of state law; this action also involves, in fact is dominated by, serious federal Constitutional issues which must be decided. Lastly, assuming *arguendo* that the state law question in this action is in fact difficult, the Supreme Court has stated that "difficulties and perplexities of state law are no reason for referral of the problem to the state court." *McNeese v. Board of Education for Community School District 187*, 373 U.S. 668, 673 n. 5, 83 S.Ct. 1433, 1436 n. 5, 10 L.Ed.2d 622 (1963) (citing *Meredith v. Winter Haven*, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9 (1943)). Thus, this argument is rejected.

 Defendants next argue that *Younger* abstention should apply. The Supreme Court in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), established a theory of abstention under which a federal court should, under certain circumstances, abstain where federal jurisdiction has been evoked for the purpose of restraining state criminal proceedings against the federal plaintiff. Defendants are correct in stating that this doctrine has been extended to also protect state civil proceedings, but only under certain circumstances. *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982). Those circumstances are not present in this action. As the First Circuit has recently reiterated, *Younger* abstention is appropriate when "there is (1) an ongoing state judicial proceeding, instituted *prior* to the federal proceeding ..., that (2) implicates an important state interest, and (3) provides an adequate opportunity for the plaintiff to raise the claims advanced in his federal lawsuit." *Brooks v. New Hampshire Supreme Court*, 80 F.3d 633, 638 (1st Cir.1996) (citing *Middlesex County Ethics Comm.*, 457 U.S. at 432, 102 S.Ct. at 2521) (emphasis added). In this instance, the federal proceeding was brought prior to the state proceeding. Consequently, the assertion that *Younger* abstention applies is without merit.

 The last type of abstention that defendants argue is applicable has come to be known as *Colorado River* type abstention. *See Colorado River Water Conservation District v. U.S.*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). While the Supreme Court did not see itself creating another abstention theory, *Colorado River*, 424 U.S. at 817–18, 96 S.Ct. at 1246, that is exactly what lower courts have interpreted the *Colorado River* decision to mean. *See, e.g., Ash v. Richard J. Lynch & Co.*, 644 F.Supp. 315, 317 ("In *Colorado River* ... the Supreme Court conferred legitimacy on a 'fourth type' of abstention"). Under this theory, a federal court should abstain to avoid duplicative litigation. 17A Wright, Miller & Cooper, *Federal Practice and Procedure* § 4247 at 117. This type of abstention, however, is not freely exercised. *See, e.g., Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.*, 800 F.2d 325, 327 (2d Cir.1986); *Ash*, 644 F.Supp. at 317. In fact, the *Colorado River* Court cautioned that such action should only be undertaken under exceptional circumstances. *Id.* at 818, 96 S.Ct. at 1246–47. In this instance, notwithstanding the fact that there would be no duplicative litigation due to the fact that state court proceedings have been stayed, no such exceptional circumstances exist to warrant *Colorado River* type abstention. Therefore, this argument is also rejected. Accordingly, none of the theories of abstention apply to this action.

### 3. *Standing to Bring Action Against Federal Defendant.*

 Federal defendant, Secretary of Labor, has moved to dismiss the claim against him on the grounds that plaintiff has failed to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(6). Federal defendant asserts that plaintiff lacks standing, because the exemptions under FUTA are permissive and not mandatory. That is, that the exemptions merely permit a state to exclude religious organizations from coverage, but do not mandate such an exclusion. Accordingly, the federal defendant argues that it is the state and state alone that has denied plaintiff benefits, and it is the state and state alone which can redress plaintiff's alleged injury.

Plaintiff, on the other hand, argues that FUTA requires states to exempt religious employers from federally approved state unemployment programs, and accordingly, the Secretary of Labor can redress the problem. Plaintiff misinterprets the provisions of FUTA. FUTA mandates state coverage of all employees except those enumerated in § 3309(b). That is, states must, in order to have a federally approved unemployment compensation program, cover employees who perform all services except those specifically exempted. *See* 26 U.S.C. § 3309(b). However, while FUTA does not mandate state coverage of those employees listed in § 3309(b), it does not prohibit states from taxing excluded services and organizations. *See St. Martin Lutheran Church v. South Dakota*, 451 U.S. 772, 775 n. 3, 101 S.Ct. 2142, 2144 n. 3, 68 L.Ed.2d 612 (1981); *see also Employment Div. v. Rogue Valley Youth for Christ*, 307 Or. 490, 770 P.2d 588, 589 n. 3 (1989) ("nothing in FUTA prohibits Oregon from taxing even excluded organizations"). In other words, FUTA permits, but does not mandate, state exclusion of those services enumerated in § 3309(b).

It does not follow, however, from such a determination that plaintiff lacks standing to sue the federal defendant. In order to have standing, a plaintiff "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). In this instance, the alleged unlawful conduct (the unconstitutional denial of unemployment benefits) is not only "fairly traceable" but is directly traceable to the federal statute. *Id.* While FUTA does not mandate an exemption for churches and religious organizations, it does permit such an exemption. If FUTA did not provide for such an exemption, a state could not exclude religious groups from unemployment coverage and still be in compliance with FUTA.

Federal defendant's assertion that FUTA compliance is voluntary for each state, while true, is of no consequence. There are heavy incentives for states to maintain FUTA compliant unemployment compensa-

tion programs. That is why all 50 states have chosen to do so. It is not only unlikely, but highly unlikely, that an amendment to 26 U.S.C. § 3309(b) removing churches and religious organizations from the exemption would cause any states to opt out of FUTA. Thus, it is also clear that a finding that § 3309(b) is unconstitutional is likely to redress the plaintiff's alleged injuries. *See Allen*, 468 U.S. at 751, 104 S.Ct. at 3324. Accordingly, federal defendant's motion to dismiss is denied.

### B. *Constitutional Analysis*

#### 1. *Establishment Clause.*

The First Amendment to the United States Constitution provides in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ." U.S. CONST. amend I. These provisions, more commonly known as the Establishment and Free Exercise Clauses, are also applicable to the States through the Fourteenth Amendment. *See Abington School District v. Schempp*, 374 U.S. 203, 215–16, 83 S.Ct. 1560, 1567–68, 10 L.Ed.2d 844 (1963). The purpose of the Establishment Clause is to ensure that government will not sponsor or promote any particular religion. *See Walz v. Tax Comm'n*, 397 U.S. 664, 669, 90 S.Ct. 1409, 1411–12, 25 L.Ed.2d 697 (1970). Conversely, the purpose of the Free Exercise clause is to safeguard the free exercise of a chosen form of religion. *Id.* Plaintiff brings this action under the former clause, arguing that the statutes in question promote religion.

The Establishment Clause has been said to have been intended to erect "a wall of separation between church and state." *McCollum v. Board of Education*, 333 U.S. 203, 211, 68 S.Ct. 461, 465, 92 L.Ed. 649 (1948) (quoting *Everson v. Board of Education*, 330 U.S. 1, 16, 67 S.Ct. 504, 512, 91 L.Ed. 711 (1947)). In 1971, in *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), the Supreme Court identified a three-part test it distilled from prior Establishment Clause jurisprudence to determine whether or not that wall has been traversed. Under the *Lemon* test, in order for a statute to survive an

Establishment Clause challenge it: (1) must have a secular legislative purpose; (2) must have as its principle or primary effect one that neither advances or prohibits religion; and (3) must not foster excessive government entanglement with religion. *Id.*

Although the continuing validity of the *Lemon* test has been questioned recently, the Supreme Court has never overruled it, and lower courts continue to apply it to Establishment Clause jurisprudence. *See, e.g., Church of Scientology Flag Service Org., Inc. v. City of Clearwater,* 2 F.3d 1514 (11th Cir.1993), *reh'g denied,* 12 F.3d 221, *cert. denied,* —— U.S. ——, 115 S.Ct. 54, 130 L.Ed.2d 13; *Bd. of Educ. of City of Chicago v. Alexander,* 983 F.2d 745 (7th Cir.1992); *Fordham Univ. v. Brown,* 856 F.Supp. 684 (D.D.C.1994); *Clever v. Cherry Hill Bd. of Educ.,* 838 F.Supp. 929 (D.N.J.1993). Accordingly, the statutes in question will be examined by parsing them in light of the three prongs of *Lemon.*

The first prong is known as the "purpose prong." This prong focuses on the actual purpose behind the government legislation and asks whether that purpose is to endorse or disapprove of religion. *Edwards v. Aguillard,* 482 U.S. 578, 585, 107 S.Ct. 2573, 2578, 96 L.Ed.2d 510 (1987). The Supreme Court has frequently noted that the fact that religious organizations benefit from legislation is of no consequence so long as the legislation has an "overall secular purpose." *See, e.g., Texas Monthly, Inc. v. Bullock,* 489 U.S. 1, 10, 14–15 & n. 4, 109 S.Ct. 890, 897, 899 & n. 4, 103 L.Ed.2d 1 (1989); *Walz,* 397 U.S. at 664, 90 S.Ct. at 1409. In determining if there is an overall secular purpose, the court "focuses on the purpose that animated *adoption* of the [legislation]." *Aguillard,* 482 U.S. at 585, 107 S.Ct. at 2578 ("a governmental intention to promote religion is clear when the State *enacts* a law to serve a religious purpose") (emphasis added). Thus, a court faced with an Establishment Clause chal-

lenge must look to the purpose of the questioned legislation as it was first enacted.

The original purpose of the provisions at issue in this case was to facilitate the administration of the federal and state unemployment programs by excluding from coverage those workers who were not recognized as full members of the permanent and stable workforce. That this original purpose is secular can not and has not been challenged by the plaintiff.[3] Plaintiff contends, however, that amendments to the statutes over the years have eliminated many of the non-religious exemptions, and thus, the statutes' purpose *now* offends the Establishment Clause. This contention is without merit. Notwithstanding the fact that the statutes still provide exemptions to non-religious as well as religious services and employers, the purpose of the statutes remain as they were when the statutes were first enacted.[4]

It must be noted that even if the purpose and intent of the statutes were to be evaluated with the statutes as they are in effect today, and not when they were first enacted, they would still pass muster under the first prong of *Lemon.* The FUTA exemptions are not "confined to religious organizations." *See Texas Monthly,* 489 U.S. at 11, 109 S.Ct. at 897. FUTA, as it reads now, exempts from mandatory state unemployment coverage services performed by:

—employees of churches or church affiliated religious organizations, *see* 26 U.S.C. § 3309(b)(1);

—ministers and members of religious orders, *see* 26 U.S.C. § 3309(b)(2);

—state and local elected officials, legislators, members of the judiciary, temporary emergency employees and certain major policy makers or advisors, and State National Guard or Air National Guard, *see* 26 U.S.C. § 3309(b)(3);

—employees with impaired physical and/or mental capabilities who are working in facilities that provide such individuals

---

**3.** Plaintiff states in its memo, "If this broad exemption were still the law, the statutes at issue would survive First Amendment Scrutiny ..."

**4.** That is not to say that legislation with an originally secular purpose cannot ever be amended

such that it would violate the Establishment Clause. Such a challenge, however, would be more properly brought under the second prong of *Lemon,* for as the purpose of a statute remains unaffected by amendments, its effect may not.

rehabilitation or renumerative work, *see* 26 U.S.C. § 3309(b)(4);

—participants in state, local, federal or federally assisted work-relief or work-training programs, *see* 26 U.S.C. § 3309(b)(5);

—inmates of custodial or penal institutions, *see* 26 U.S.C. § 3309(b)(6);

—all employees in nonprofit organizations that do not employ at least four employees at least twenty days a year, *see* 26 U.S.C. § 3309(c).

Likewise, the Rhode Island Employment Security Act exempts not only service performed in the employ of churches or religious organizations, but also:

—domestic service in a private home for which the employee does not receive at least $1000.00 per year, *see* R.I.G.L. § 28–42–8(1);

—service performed by a parent for a child, by a spouse for a spouse or by a minor child for a parent, *see* R.I.G.L. § 28–42–8(2);

—certain service performed in the employ of a state government (other than Rhode Island) or federal government, *see* R.I.G.L. § 28–42–8(3);

—services performed by employees with impaired physical and/or mental capabilities who are working in facilities that provide such individuals rehabilitation or renumerative work, *see* R.I.G.L. § 28–42–8(4)(iii);

—services performed by participants in state, local, federal or federally assisted work-relief or work-training programs, *see* R.I.G.L. § 28–42–8(4)(iv);

—services performed in a hospital by a patient of the hospital, *see* R.I.G.L. § 28–42–8(4)(v);

—services performed by an inmate of a custodial or penal institution, *see* R.I.G.L. § 28–42–8(4)(vi);

—services which are occasional, irregular or incidental and are not in the course of an employer's trade or business, *see* R.I.G.L. § 28–42–8(8);

—service as an "independent" golf caddy, *see* R.I.G.L. § 28–42–8(9);

—services performed by certain commission only real estate salespersons, *see* R.I.G.L. § 28–42–8(10);

—services performed by certain commission only insurance brokers, agents or sub agents, *see* R.I.G.L. § 28–42–8(11);

—services performed by students in co-op work programs, *see* R.I.G.L. § 28–42–8(12);

—services performed by certain workers on small fishing vessels, *see* R.I.G.L. § 28–42–8(13).

It is abundantly clear that neither of these statutes, on their face, manifest any governmental intent or purpose to advance or promote religion. Instead it is clear that the statutes reflect a wholly secular purpose. That purpose is, as it always has been, the facilitation of the administration of the federal and state unemployment benefits programs by excluding employees who are typically not fully active or permanent members of the stable workforce. The amendments to these statutes do not reflect, as plaintiff would suggest, an increasing governmental interest in the promotion of religion. Instead the amendments reflect government's recognition of the increasing role that certain non-profit organizations have in our society as a whole and more specifically in providing members of the stable workforce. Thus, absolutely no sectarian purpose is evinced by these statutes. Any religious benefit that results as a consequence of this secular purpose is purely incidental. Accordingly, the first prong of the *Lemon* test is met.

The second prong of *Lemon* requires that the challenged statute must not have a principle or primary effect that either advances or inhibits religion. 403 U.S. at 612, 91 S.Ct. at 2111. This does not mean that a law is unconstitutional because it allows churches to advance religion. *Corp. of Presiding Bishop of the Church of Jesus Christ of Latter–day Saints v. Amos,* 483 U.S. 327, 337, 107 S.Ct. 2862, 2869, 97 L.Ed.2d 273 (1987). The *Amos* Court pointed out that many laws that have been held constitutional have allowed religious groups to more ably advance their purposes. *Id.* at 336, 107 S.Ct. at 2868. The statutes in question here are no exception. Without question, the FUTA and Rhode Is-

land Employment Security Act exemptions benefit religious organizations by not compelling them to pay unemployment taxes. It could even be said that the exemptions may allow religious groups to better advance their purposes because of the monetary savings involved. This, however, is not unconstitutional. *See Amos*, 483 U.S. at 336–37, 107 S.Ct. at 2868–69.

In order for a law's effects to run afoul of the second prong of *Lemon*, "it must be fair to say that the *government itself* has advanced religion through its own activities and influence." *Id.* at 337, 107 S.Ct. at 2869 (no emphasis added). In this instance, it can hardly be said that the governments' actions (i.e.: unemployment tax exemptions) advance religion.[5] No reasonable person is likely to form a religious belief based in any part on the fact that the organization does not have to pay unemployment taxes. It would be ludicrous to say that this exemption would compel "nonadherents to support the practices or proselytizing of ... religious organizations." *Texas Monthly*, 489 U.S. at 9, 109 S.Ct. at 896. Additionally, as noted above, the statutes in question provide exemptions to non-religious groups and services as well. Thus, the primary effect of the statutes is not to advance religion, and the second prong of *Lemon* is not offended.

The third prong of the *Lemon* test provides that a statute must not foster an excessive government entanglement with religion. *Lemon*, 403 U.S. at 613, 91 S.Ct. at 2111. The Supreme Court has held that the excessive entanglement prong of *Lemon* "prohibits intrusive government inquiry into religious belief." *Amos*, 483 U.S. at 339, 107 S.Ct. at 2870. The Court has also stated that this leads to a query of "whether the [government] involvement ... is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement." *Walz v. Tax Commission of New York*, 397 U.S. 664, 675, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970). The statutes in question here lead to the exact opposite result. Rather than promoting entanglement with

religion the statutes foster the separation of church and state that the First Amendment requires. Because of the statutes, the federal government and state government need not continuously monitor and audit exempt religious organizations to ensure compliance with FUTA and the Rhode Island Employment Security Act. In fact, the Supreme Court addressed this very issue in *Walz*, stating that the primary effect of a tax exemption was not to sponsor religious activity but to "restrict the fiscal relationship between church and state" and to "complement and reinforce the desired separation insulating each from the other." 397 U.S. at 676, 90 S.Ct. at 1415; *see also Texas Monthly*, 489 U.S. at 43, 109 S.Ct. at 914–15 (Scalia J., dissenting). Accordingly, the statutes do not promote excessive government entanglement in matters of religion, and the third and final prong of *Lemon* is met.

Plaintiff relies heavily on the Supreme Court's opinion in *Texas Monthly v. Bullock*, supra. That reliance, however, is misplaced. First, this case is easily distinguished. Most importantly, the statute at issue in *Texas Monthly* exempted *only* religious organizations. 489 U.S. at 14, 109 S.Ct. at 899. As noted above, that is simply not so in this case. Additionally, the Supreme Court made particular note of the fact that the exemption in *Texas Monthly* was only "targeted at writings that *promulgate* the teachings of religious faiths." *Id.* at 13, 15, 109 S.Ct. at 898, 899–900. (emphasis not added). Again that is not so in this case. Nevertheless, plaintiff also contends that *Texas Monthly* stands for the proposition that if tax exemptions extend to religious organizations, they *must* also extend to a broad array of non-profit organizations in order to be constitutional. That, however, is not correct. The Court in *Texas Monthly* specifically stated, "[h]ow expansive the class of exempt organizations or activities must be to withstand constitutional assault depends upon the State's secular aim in granting a tax exemption." 489 U.S. at 15, 109 S.Ct. at 900. In this instance the list of exempt services and organizations is wholly consistent with the secular purpose as noted

---

**5.** In fact, to the contrary, it might be argued that because of the exemptions, religious organizations are at a disadvantage in being able to hire employees because they won't be covered by unemployment benefits.

above. Accordingly, the statutes in question do not run afoul of the Supreme Court's decision in *Texas Monthly,* and more importantly, also pass muster under the *Lemon* test. Thus, they do not violate the Establishment Clause of the First Amendment to the United States Constitution.

## 2. *Equal Protection*

■ Plaintiff also argues that the exemptions violate the Equal Protection Clause. Because the statutes in question are rationally related to a legitimate interest, this claim also fails.

■ There is no fundamental right to the payment of unemployment benefits, and there is no suspect or quasi-suspect classification involved. Accordingly, in order to withstand an equal protection challenge, the statutory exemptions in question here need only be rationally related to a legitimate governmental interest. *Ohio Bureau of Employment Servs. v. Hodory,* 431 U.S. 471, 489, 97 S.Ct. 1898, 1908–09, 52 L.Ed.2d 513 (1977). This burden is met.

It has long been held that "[n]either due process nor equal protection imposes upon a state any rigid rule of equality of taxation." *Carmichael v. Southern Coal & Coke Co.,* 301 U.S. 495, 509, 57 S.Ct. 868, 872, 81 L.Ed. 1245 (1937). So long as a distinction rests upon a rational basis, inequalities which result from singling out a particular class or classes for taxation or exemptions are not unconstitutional. *Id.* This rational-basis standard is a relaxed standard which reflects the belief that creating distinctions is an unavoidable legislative task. *Hodory,* 431 U.S. at 489, 97 S.Ct. at 1908–09. Therefore, when a statute does not involve a fundamental interest or affect with particularity a protected class, it is presumed to be valid. *Id.*

In this instance, the purposes behind the religious exemptions of FUTA and the Rhode Island Employment Security Act are noted above. Additionally, the statutes promote the efficient administration of Rhode Island's unemployment insurance program by avoiding undue government involvement in problems peculiar to religious employment. *See Claim of Klein,* 78 N.Y.2d 662, 578 N.Y.S.2d 498, 504, 585 N.E.2d 809, 815 (1991). The statutes are rationally related to these legitimate governmental purposes. Thus, the Equal Protection Clause is not offended.

## 3. *Rhode Island Constitution*

■ Plaintiff also contends that R.I.G.L. § 28–42–8(4) violates Article I, § 3 of the Rhode Island Constitution. Article I, § 3 is titled "Freedom of Religion" and provides in relevant part:

"... no person shall be compelled to frequent or to support any religious worship, place, or ministry whatever, except in fulfillment of such person's voluntary contract; nor enforced restrained, molested, or burdened in body or goods; nor disqualified from holding any office; nor otherwise suffer on account of such person's religious belief; and that every person shall be free to worship God according to the dictates of such person's conscience, and to profess and by argument to maintain such person's opinion in matters of religion; and that the same shall in n wise diminish, enlarge, or affect the civil capacity of any person." (Michie 1987)

For the following reasons, the religious exemptions to the Rhode Island Employment Security Act do not offend the above provision.

■ A federal court, in deciding a question of state law, sits in place of the highest state court and must discern how that court would decide the state issue. *See Oresman v. G.D. Searle & Co.,* 321 F.Supp. 449, 453 (D.R.I.1971). In this instance, however, that is not necessary as the Supreme Court of Rhode Island has already decided the issue of whether tax exemptions for religious organizations violate the Rhode Island Freedom of Religion Clause. In the 1961 case of *General Finance Corp. v. Archetto,* 93 R.I. 392, 176 A.2d 73 (1961), the Rhode Island Supreme Court had before it the question of whether or not an exemption for religious organizations from the payment of property taxes offended Article I, § 3 of the State Constitution. In deciding that the Freedom of Religion Clause was not violated, the court noted that exemptions for churches and religious groups "were common prior to as well

as after the adoption of [the Rhode Island] constitution in 1842." *Id.,* 176 A.2d at 77. Thus, the relevant inquiry was whether the people intended, by adopting Article I, § 3, to prohibit to the legislature the authority to exempt religious organizations from certain tax burdens. *Id.* The Rhode Island Supreme Court answered that query in the negative. *Id.* A federal court is "bound ... by the actual expression of the state's highest court" on issues of state law. *Jackson v. Liquid Carbonic Corp.,* 863 F.2d 111, 115–16 (1st Cir.1988), *cert. denied,* 490 U.S. 1107, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989). Accordingly, the religious exemptions of R.I.G.L. 28–42–8(4) do not offend the Freedom of Religion Clause of the Rhode Island Constitution.

## III. CONCLUSION

For the foregoing reasons, the provisions of FUTA and the Rhode Island Employment Security Act exempting religious organizations and churches from the payment of unemployment benefit taxes are held to be constitutional under both the United States Constitution and the Rhode Island Constitution.

So Ordered.