**Guadalupe ROJAS, Plaintiff–Appellant,**

v.

**Lawrence FITCH, et al., Defendants–Appellees.**

**Guadalupe ROJAS, Plaintiff–Appellee,**

v.

**Dr. Lee H. ARNOLD, et al., Defendants–Appellants.**

Nos. 96–2328, 97–1089.

United States Court of Appeals, First Circuit.

Heard June 2, 1997.

Decided Oct. 9, 1997.

John W. Dineen, with whom Yesser, Glasson & Dineen, Providence, RI, was on brief for appellant Guadalupe Rojas.

Scott Glabman, Attorney, Washington, DC, with whom J. Davitt McAteer, Acting Solicitor of Labor, Mount Hope, WV, Charles D. Raymond, Associate Solicitor for Employment and Training, Legal Services, and Harry L. Sheinfeld, Counsel for Litigation, U.S. Department of Labor, Office of the Solicitor, Washington, DC, were on brief for appellee Cynthia A. Metzler, Acting Secretary of Labor.

Rebecca Tedford Partington, Assistant Attorney General, Providence, RI, for appellee Dr. Lee Arnold, Director, Rhode Island Department of Labor and Training.

Michael G. Dolan, with whom Cadwalader, Wickersham & Taft, and Gerard P. Cobleigh, Warwick, RI, were on brief for appellee Salvation Army.

Before TORRUELLA, Chief Judge, CAMPBELL, Senior Circuit Judge, and BOUDIN, Circuit Judge.

TORRUELLA, Chief Judge.

Plaintiff–Appellant Guadalupe Rojas, a former employee of the Salvation Army, sought a declaratory judgment that exemptions for religious employers under the Rhode Island unemployment tax statute and under the Federal Unemployment Tax Act ("FUTA"), 26 U.S.C. §§ 3301–3311, violate the Establishment Clause and the Equal Protection Clause of the federal Constitution, as well as Article I, § 3 of the Rhode Island Constitution, which protects the Freedom of Religion. She named as defendants the director of the Rhode Island Department of Employment and Training ("DET") and the Secretary of the federal Department of Labor. The Salvation Army intervened as a defendant. The district court rejected all of Rojas's substantive arguments for declaratory relief, *see Rojas v. Fitch*, 928 F.Supp. 155, 162–67 (D.R.I. 1996), and now, on appeal, she reasserts her federal Establishment Clause and Equal Protection claims. We affirm.

## BACKGROUND

The following facts are not disputed. Rojas was a paid employee of the Salvation Army, serving as a social case worker from 1988 to 1994, except for a short interruption in 1990 and 1991 when she worked for Catholic Social Services. Rojas was not, and was not required to be, a soldier or member of the Salvation Army when employed as a case worker. The Salvation Army terminated her employment on March 18, 1994, citing financial constraints.

Approximately one month after her termination, Rojas applied for unemployment insurance benefits from the DET. The DET found that Rojas was ineligible because her former employer, the Salvation Army, was exempt from contributing to Rhode Island's unemployment insurance scheme under sections 28–42–8(4) and 28–44–11 of the Rhode Island General Laws.[1] Pursuant to the exemption for religious employers under section 28–42–8(4), no taxes were withheld from Rojas's wages by the Salvation Army, and her income was not reported to the DET. The DET's denial of benefits was upheld by a DET referee after a hearing, and later the referee's determination was upheld by the DET Board of Review.

On September 9, 1994, Rojas initiated an action in federal district court against the Director of the DET, seeking declaratory invalidation of the exemption under either

---

**1.** In 1987, the DET determined that the Salvation Army is a "church" and thus entitled to an exemption pursuant to R.I. Gen. Laws § 28–42–8(4).

the Establishment Clause,[2] the Equal Protection Clause,[3] or Article I, § 3 of the Rhode Island Constitution.[4] In an amended complaint, Rojas added the Secretary of the Department of Labor as a defendant, on the theory that FUTA's allowance of state exemptions for religious employers in the federal-state unemployment insurance system was an underlying cause of the Rhode Island exemption she challenged. *See* 26 U.S.C. 3309(b) (FUTA provision listing permissible employer exemptions, including exemption for religious employers). The Salvation Army was allowed to intervene, without objection, as a defendant.

FUTA establishes a federal-state unemployment benefit scheme requiring employers to pay a federal excise tax, *see* 26 U.S.C. § 3301 (computing the tax as a percentage of wages of covered employees), but encouraging the development of state unemployment insurance programs in the following ways: first, employers paying into a qualifying state unemployment fund are entitled to a credit on the federal tax, *see* 26 U.S.C. § 3302, and second, a qualifying state is entitled to receive federal grants toward the cost of administering the state's unemployment compensation program, *see* 42 U.S.C. § 503. Rhode Island's unemployment fund qualified for participation in the FUTA system.

FUTA exempts certain classes of employees from mandatory state coverage by a qualifying state plan. *See* 26 U.S.C. § 3309(b). The current scope of exemptions reflects amendments made to FUTA by Congress in 1976. The 1976 Amendments narrowed the set of employees who were exempt from mandatory state coverage, by requiring, for example, that previously exempted school employees be covered. In 1970 as well, the scope of FUTA exemptions was narrowed significantly by Congress when it repealed a broad exemption previously available to all nonprofit organizations. *See generally California v. Grace Brethren Church,* 457 U.S. 393, 397, 102 S.Ct. 2498, 2502, 73 L.Ed.2d 93 (1982) (describing the 1970 and 1976 FUTA Amendments).

Currently, the segments of the labor force that the states are not required to cover under FUTA section 3309(b) include persons "in the employ of (A) a church or convention or association of churches, or (B) an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches." 26 U.S.C. § 3309(b)(1). Also exempt are employees of small nonprofit organizations (having fewer than four regular employees), *see* § 3309(c), elected state employees, *see* § 3309(b)(3), employees at certain rehabilitation facilities, *see* § 3309(4)(A), and inmates of custodial or penal institutions, *see* § 3309(b)(6).

The Rhode Island Employment Security Act ("RIESA"), R.I.G.L. §§ 28–42–1 *et seq.,* exempts a variety of kinds of employment from coverage. *See* R.I. Gen. Laws § 28–42–8 (1995). Apparently tracking the language of FUTA, Section 28–42–8(4)(i) exempts service performed "in the employ of: (A) A church or convention or association of churches, or (B) an organization which is operated, supervised, controlled, or principally supported by a church or convention or association of churches." Other exempted employees under RIESA include certain insurance brokers, golf caddies, certain rehabilitation center employees, and certain real

---

**2.** U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof....").

**3.** U.S. Const. amends. V, XIV.

**4.** Article I, § 3 provides, in pertinent part:

... no person shall be compelled to frequent or to support any religious worship, place, or ministry whatever, except in fulfillment of such person's voluntary contract; nor enforced, restrained, molested, or burdened in body or goods; nor disqualified from holding any office; nor otherwise suffer on account of such person's religious belief; and that every person shall be free to worship God according to the dictates of such person's conscience, and to profess and by argument to maintain such person's opinion in matters of religion; and that the same shall in no wise diminish, enlarge, or affect the civil capacity of any person. R.I. Const. art. I, § 3. Rojas also appealed the decision of the DET board in state court, a suit which has been stayed pending resolution of her federal civil action.

estate brokers. R.I. Gen. Laws §§ 28–42–8(11), (9), (4)(B)(iii), (10).

The defendants raised a number of procedural claims below, all of which were rejected by the district court. Upon reaching the merits of Rojas's suit, the district court rejected all of her claims. On appeal, Rojas argues that the Rhode Island and FUTA exemptions for religions violate the Establishment Clause and the Equal Protection Clause of the federal Constitution, while the appellees reassert their claims that jurisdiction is lacking because of the Tax Injunction Act, 28 U.S.C. § 1341 and that the appellant lacks standing.

## DISCUSSION

Because we find that the appellant's claims fail on the merits, we need not reach either the claim put forward by the federal defendant-appellee that Rojas lacks standing to challenge FUTA or the claim put forward by the state defendant-appellee that the Tax Injunction Act bars federal jurisdiction over the suit. *See Norton v. Mathews,* 427 U.S. 524, 530–31, 96 S.Ct. 2771, 2774–75, 49 L.Ed.2d 672 (1976); *Hachikian v. FDIC,* 96 F.3d 502, 506 n. 4 (1st Cir.1996) (" 'It is a familiar tenet that when an appeal presents a jurisdictional quandary, yet the merits of the underlying issue, if reached, will in any event be resolved in favor of the party challenging the court's jurisdiction, then the court may forsake the jurisdictional riddle and simply dispose of the appeal on the merits.' ")(quoting *United States v. Stoller,* 78 F.3d 710, 715 (1st Cir.1996)).

## I. The Establishment Clause Claim

At the core of the Establishment Clause is the idea that government cannot "favor religion over nonreligion, nor sponsor a particular sect, nor try to encourage participation in or abnegation of religion." *Walz v. Tax Comm'n,* 397 U.S. 664, 694, 90 S.Ct. 1409, 1424, 25 L.Ed.2d 697 (1970) (Harlan, J., concurring) (noting that while disagreements over applications of Establishment Clause are common, its core ideal is well established). In order to vindicate this constitutional guarantee, two tests have long guided judicial review of any challenged legislation:

first, the law must have a purpose other than to advance or inhibit religion; second, the primary effect of the law must not be to advance or inhibit religion. *See, e.g., Abington School District v. Schempp,* 374 U.S. 203, 222, 83 S.Ct. 1560, 1571–72, 10 L.Ed.2d 844 (1963) ("The test may be stated as follows: what are the purpose and primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution."). A third practical concern under the Establishment Clause is that the net effect of governmental programs avoid "excessive governmental entanglement with religion." *Walz,* 397 U.S. at 674, 90 S.Ct. at 1414.

These threads were united in the well-known three-part test in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), which provides: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances or inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.' " *Id.* at 612–13, 91 S.Ct. at 2111 (quoting *Walz* ) (citation omitted). The district court applied the *Lemon* test in the course of holding that FUTA and the RIESA did not violate the Establishment Clause. *See* 928 F.Supp. at 163–66. This approach was appropriate, for the Supreme Court, despite criticisms of previous applications of the *Lemon* test, essentially confirmed in *Agostini v. Felton,* —— U.S. ——, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), that the *Lemon* criteria still apply. *See* —— U.S. at ——, ——, 117 S.Ct. at 2010, 2015.

In *Agostini,* the Court overruled its Establishment Clause decision in *Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985)—which had barred the New York City Board of Education from sending public school teachers into sectarian private schools to teach remedial classes pursuant to Title I—but nevertheless stated that the general tests used in analyzing challenged legislation under the Establishment Clause had *not* changed. The *Agostini* decision reaffirmed the need to ascertain that laws have a secular purpose and a primary effect other than

advancing religion, *see* —— U.S. at ——, 117 S.Ct. at 2010, and explicitly incorporated the entanglement prong into the effects calculus, thereby making the third prong of *Lemon* a part of the second prong, *see id.* at 2016. The Court in *Agostini* noted that what has changed since *Aguilar* are certain presumptions regarding the effects of neutral laws that incidentally confer benefits to religions. *See* —— U.S. at —— – ——, 117 S.Ct. at 2010–13 (stating that the Court no longer considers the presence of public school employees on parochial school property to lead ineluctably to the impermissible effect of advancing or endorsing religion where their presence is part of neutral program).

■ The district court properly found that the FUTA and RIESA exemptions had neither an impermissible purpose, nor an impermissible effect on religion. First, both the FUTA and the RIESA exemption provisions serve the secular purpose of facilitating the administration of the federal-state unemployment insurance program by excluding from coverage a variety of workers whose employment patterns are irregular or whose wages are not easily accountable. With regard to FUTA, Rojas concedes that the original purpose of the coverage exemptions was to address administrability concerns. She contends, however, that the current 26 U.S.C. § 3309, viewed in the wake of the 1970 and 1976 Amendments, reflects the purpose of favoring religion rather than the secular purpose of providing ease of administration. Rojas is unable to direct our attention to, nor can we find, any indications in the legislative history of the 1970 and 1976 Amendments that suggest an impermissible purpose of advancing religion in general or any particular religion. *See, e.g., Wallace v. Jaffree,* 472 U.S. 38, 56, 105 S.Ct. 2479, 2489, 86 L.Ed.2d 29 (1985) ("[T]he First Amendment requires that a statute must be invalidated if it is entirely motivated by a purpose to advance religion."). Moreover, the current exemption for religious employment, even after the amendments, still rests within the context of a variety of other exemptions, all of which appear to share a common secular purpose. Efficient administration of the unemployment compensation system is particularly enhanced through the exemptions for religion because it eliminates the need for the government to review employment decisions made on the basis of religious rationales. These considerations are also true of the exemptions listed in R.I. Gen. Laws § 28–42–8(1). The exemption for religions contained therein, when viewed in context, is innocuous. It appears to serve the interest in facilitating the administration of federal and state unemployment benefits programs, and Rojas can point to no other evidence that the "purpose that animated adoption" was to advance religion. *Edwards v. Aguillard,* 482 U.S. 578, 585, 107 S.Ct. 2573, 2578, 96 L.Ed.2d 510 (1987). In *Walz,* the Supreme Court upheld property tax exemptions for religious institutions, arguing that such exemptions, although not required by the Free Exercise Clause, were valid governmental actions "productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." 397 U.S. at 669, 90 S.Ct. at 1412. Including religious institutions within a set of unemployment tax exemption recipients—selected on the basis of reducing difficulties in administering an unemployment insurance program—reflects less of a desire to sponsor religion than the direct property tax exemptions upheld in *Walz.*

■ Rojas's brief on appeal places much weight on *Texas Monthly v. Bullock,* 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989), which struck down a narrow Texas sales and use tax exemption for " 'periodicals that are published or distributed by a religious faith and that consist wholly of writings promulgating the teaching of the faith and books that consist wholly of writings sacred to a religious faith.' " *Id.* at 5, 109 S.Ct. at 894 (quoting Texas statute). Although *Texas Monthly* stands for the proposition that a subsidy that is granted only to religious publications and not to other similar publications "lacks sufficient breadth to pass scrutiny under the Establishment Clause," it also stated that "[i]nsofar as [a tax] subsidy is conferred upon a wide array of non-sectarian groups as well as religious organizations in pursuit of some legitimate secular end, the fact that religious groups benefit incidentally does not deprive the subsidy of the secular purpose

and primary effect mandated by the Establishment Clause." 489 U.S. at 14–15, 109 S.Ct. at 899. The exemption provisions at issue in the instant case fall within the latter category. We decline Rojas's invitation to read *Texas Monthly* as requiring that a provision incidentally benefitting religion *must* grant a like benefit to every group that could also conceivably fall within the secular rationale for the exemption provision. *Texas Monthly* nowhere requires this underinclusiveness analysis, but instead indicates that when a "wide array" of groups are benefitted by a provision that pursues a single, unifying, secular end, one of these groups may indeed be religious institutions. In *Texas Monthly*, the other Texas sales tax exemptions did not serve the same purpose as the narrow exemption for religious periodicals, and thus their existence could not rescue the challenged exemption. By contrast, an adequate array of groups are exempted under the FUTA and RIESA provisions, reinforcing our conclusion that the religious exemptions here serve the legitimate secular purpose of facilitating the administration of the unemployment insurance system.[5]

█ The second basic Establishment Clause concern is that of avoiding the effective promotion or advancement of particular religions or of religion in general by the government. Although favoritism toward any particular sect is not an issue raised by this appeal, it is not disputed that religious institutions as a whole benefit from the FUTA and RIESA tax exemptions. An incidental benefit to religion does not, however, render invalid a statutory scheme with a valid secular purpose. *See, e.g., Agostini,* — U.S. at ——, 117 S.Ct. at 2014; *Zobrest v. Catalina Foothills Sch. Dist.,* 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993); *Witters v. Washington Dept. of Servs.,* 474 U.S. 481, 488–89, 106 S.Ct. 748, 751–52, 88 L.Ed.2d 846

(1986); *Walz,* 397 U.S. at 664.the exemptions is not to force the general public to subsidize religion. Rather, the primary practical effect of the exemptions for religious institutions is to exclude former employees of such institutions from participating in the Rhode Island unemployment insurance system.

Finally, as the district court correctly reasoned, entanglement concerns are in fact reduced through the adoption of the exemptions in this case. *See* 928 F.Supp. at 165.

## II. Equal Protection

With regard to Rojas's claim that the FUTA and RIESA tax exemptions for religious employers violate constitutional equal protection principles, we affirm the district court for substantially the grounds given in its opinion. *See* 928 F.Supp. at 166. Although Rojas recasts her equal protection claim slightly on appeal, arguing that the district court erred by focusing on the difference in treatment of employers rather than on the difference in treatment of employees of exempt and non-exempt entities, the rationality requirement under the equal protection clause is equally lenient from either vantage. The same considerations that led the district court to find no equal protection violation with regard to the difference in treatment of exempt and non-exempt employers applies to exempt and non-exempt employees as well.

## CONCLUSION

For the reasons stated above, the decision of the district court is *affirmed.*

**5.** We therefore need not address the defendants' alternative legal argument in defense of the exemptions, namely that even were the exemption provided *only* to religions, it would still serve the legitimate secular purpose of decreasing governmental entanglement with religion. It is well established that "it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious mis-

sions." *Corporation of the Presiding Bishop of the Church of Jesus Christ of the Latter–day Saints v. Amos,* 483 U.S. 327, 335, 107 S.Ct. 2862, 2868, 97 L.Ed.2d 273 (1987) (upholding exemption for religious institutions from Title VII's prohibition against religious discrimination in employment for secular activities of a nonprofit). But again, we do not need to consider whether the exemptions at issue here are supported on this accommodation rationale.